### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

Case No. 24-cv-21226-RUIZ/TORRES

EDWIN A. HERNANDEZ and
EGLA CORP.,

      *Plaintiffs*,

v.

STINGRAY GROUP INC., et al.,

      *Defendants*.

_____/


### <u>ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION</u>

The pending motion relates to Plaintiffs' ("EGLA Corp." and "Dr. Hernandez") Second Motion for Preliminary Injunction. [D.E. 89]. Defendants filed their response [D.E. 149], and Plaintiffs filed their reply. [D.E. 160]. The Motion, therefore, is ripe for disposition.[1] The motion can be denied, however, on the existing record based on the Court's inability to find any irreparable harm to sustain injunctive relief. Accordingly, and for the reasons we explain below, Plaintiffs' Motion is **DENIED**.

---

[1] On September 18, 2024, this Motion was referred to Magistrate Judge Lauren Fleischer Louis for a Report and Recommendation. [D.E. 155]. On October 22, 2024, Magistrate Judge Louis entered an Order of Recusal [D.E. 183], and the case was reassigned to the Undersigned Magistrate Judge for all further, referred proceedings.

## I.    BACKGROUND

This case arises out of Defendants' purportedly improper use of Plaintiffs' audio and video technology. Specifically, Plaintiffs allege that Dr. Hernandez developed "technology to deliver audio and video content using cloud-based platforms and mobile applications using secure remote servers." [D.E. 82 at ¶ 2]. Some of this technology resulted in three U.S. patents ("the Asserted Patents"). [*Id*.]. And prior to the technology accruing into the Asserted Patents, Dr. Hernandez avers that the technology also constituted trade secrets (some of which remain protected as such for non-patented, proprietary information).

Specifically, Plaintiffs contend that around 2012 to 2013, Dr, Hernandez developed an audio-only broadcasting platform for cable operators and replace satellite delivery that was delivered from a server without using hardware encoders and was compatible with cable TV Set Top Boxes. The audio-only streaming solutions was designed in several ways using several streaming protocols. His idea was to develop a new platform that integrated existing web-widgets, javascripts, and Cascade Style Sheets (CSS) to provide a graphical User Experience (UX) with metadata and high-quality music content.  Plus, around 2013, Dr. Hernandez also investigated and came up with a process to generate, not only audio streams, but also video streams incorporate visual components to the stream.

From about 2013 to mid-2014, Dr. Hernandez continued to work on developing proprietary technology, including creating visual components were rendered and generated on-the-fly with metadata, configurable backgrounds, and music content. In

or around mid-2014, Dr. Hernandez perfected these innovations while developing his latest version of the platform's source code. Collectively, these innovations for delivering multi-media are "Dr. Hernandez's Trade Secrets."

During the course of his work, in 2013 Dr. Hernandez, through his corporate entity EGLA, negotiated an agreement with Mood Media's predecessor, DMX, to license Dr. Hernandez's secret technology under numerous confidentiality conditions. Plaintiffs allege that, at the time that term sheet was negotiated, Plaintiffs were unaware that Stingray, a larger corporation, was on the brink of acquiring DMX/Mood Media. The license agreements were then executed.  But later, when Dr. Hernandez discovered that Stingray – a non-party to the license agreements – acquired Mood Media in March of 2014, Dr. Hernandez feared that Stingray would engage in unauthorized use of his technology.

Shortly thereafter in April 2014, Dr. Hernandez was so concerned about the invasion of his trade secrets by Stingray that he emailed the *Department of Homeland Security* to report his concern that Stingray potentially had unauthorized access to Dr. Hernandez's servers.  He did not, however, seek any relief before this Court or any other court to enforce his rights under the EGLA agreement and his proprietary rights in the technology.

He also emailed individuals he had been working with at Mood Media.  [D.E. 82-11].  In those 2014 communications, Dr. Hernandez expressed his willingness to continue working with DMX/Mood Media but demanded that "Stringray Digital . . . take a platform license for the Mediamplify Music Platform, and *cease and desist* any

use of any competitor products that circumvent our products starting today."  He also demanded that Mood Media address its multiple breaches of the term sheet and their confidentiality agreement by, among other things, wrongly transferring his technology to Stingray without his consent.  [D.E. 82-11 at 3].

In response, Dr. Hernandez received an email from Stingray that Stingray did not have "knowledge of, nor involvement on, the specifics of Mood Media's content delivery technology—EGLA's or otherwise—nor has the intention of acquiring or learning such technology." [D.E. 82 ¶ 66].  Mood Media also proceeded to terminate the term sheet with EGLA on the grounds that Mood Media no longer required its services after receiving Dr. Hernandez's "breach of contract notification." [D.E. 82-11 at 1].

No lawsuit immediately followed from these allegations, however.  The parties continued to engage in discussions and reached a settlement agreement (which Plaintiffs now attest was the product of "fraud") that was executed on October 30, 2014.  The agreement between DMX/Mood Media and EGLA acknowledged the parties' pending disputes relating to the 2013 term sheet and the need to resolve such disputes through a final settlement and release from EGLA.  It provided that EGLA would agree to this resolution in exchange for a payment of $59,890. [D.E. 148-3].  So, by this point, Dr. Hernandez and EGLA were fully aware of the existence of multiple claims against his licensees and Stingray, yet he released them from any further liability relating to or arising from the term sheet.

Given this purported resolution of all such claims, litigation was deemed unnecessary and was not pursued.  Instead, Dr. Hernandez sought to protect his technology further through U.S. patent applications that successfully culminated in the three system/method patents in suit in this action.  Those applications were filed and prosecuted beginning in December 2014, which resulted in the issuance of the three patents in 2018, 2019 and 2021.

Though he placed Defendants on notice in April 2014 of material breaches of his license agreement and Stingray's wrongful acquisition of his intellectual property, seven years passed without any enforcement efforts on Dr. Hernandez or EGLA's part.  Then, in 2021 Dr. Hernandez purportedly "discovered," as he feared and suspected seven years earlier when Stingray "acquired" his technology back in 2014, that Stingray was in fact wrongly using his technology and trade secrets.  He claims that this discovery followed an April 11, 2021, internet search when Dr. Hernandez discovered a website (Trello.com), in which Stingray allegedly used Dr. Hernandez's source code to create its own version of Dr. Hernandez's server (Ubiquicast OSE2).  Plaintiffs also allege that Stingray's value and revenue increased dramatically right around the time Stingray began employing Dr. Hernandez's technology.

By this same time period in 2021, Dr. Hernandez was issued by the PTO two of the three patents that he sought back in 2014, and he was also in the process of receiving a patent for his third application.  By then, he also knew that he had entered into a settlement agreement with DMX/Mood Media purportedly releasing all claims arising from the term sheet, which he now claims was fraudulent because DMX/Mood

Media had maintained all along that Stingray was not accessing his technology.  Yet, even though he felt hoodwinked and defrauded by the Defendants, he still did not resort to any judicial relief.  He in effect sat on his hands for an additional three years as it relates to Stingray and its wrongful acquisition and use of his proprietary technology.

He admits, however, that around this time period he was not sitting on his hands with respect to *other* suspected wrongdoers who were also invading his property rights.  During the time period when he *knew* that Stingray and these Defendants were still violating his property rights, he went to court against other infringers.  As he attests in his supporting affidavit, he was busy dealing with a separate lawsuit that tied up his "resources . . . fighting the infringement of Plaintiff's patent rights against other infringers, including Defendant AT&T and CellCo Partnership/Verizon Wireless. From December of 2017 until August of 2021, I was embroiled in litigation with Verizon of the infringement of its patents. . . ." [D.E. 90 at 3-4].

That is not all that occupied his time and tied up his resources.  "From August of 2021 through June of 2023, I, like many other individuals and businesses, was significantly adversely impacted by the Covid pandemic. During this time, I relocated my business and experienced a significant reduction in income from the office rentals and startup consulting at the EGLAVATOR incubator. Beginning in June of 2023, through my company Mobility Workx, I instituted litigation over the same patents against AT&T. . . . The parties to that litigation recently reached an agreement in

principle to settle that lawsuit. To free up additional resources, I recently terminated funding of my technology incubator, which allowed me to pursue its claims against the instant Defendants." [D.E. 90 at 4].

But, again, no further action was taken viz-a-viz Stingray for an additional *three* years even though he had the resources and time to sue other defendants, pursue his patent applications, further develop his technology, and stave off the COVID epidemic. The Court notes, however, that this Court and all other federal courts remained fully open and functional during the entire epidemic period.

Fast forward three years later to 2024. Armed with additional resources and time, Dr. Hernandez and EGLA turned their attention, finally, to these Defendants. In 2024 (ten years after Dr. Hernandez first learned of Stingray's wrongful acquisition of his technology from DMX/Mood Media) Plaintiffs filed this action, which now hinges on the now-Second Amended Complaint that asserts the following claims:

- Count I: Violation of Defend Trade Secrets Act (against Stingray and Mood Media);

- Count II: Violation of Florida Uniform Trade Secret Act (against Stingray and Mood Media);

- Count III: Infringement of Patent No. 10,123,074 (against all Defendants except Stingray Music USA and Mood Media);

- Count IV: Infringement of Patent No. 10,524,002 (against all Defendants except Stingray Music USA and Mood Media);

- Count V: Infringement of Patent No. 11,140,441 (against all Defendants except Stingray Music USA and Mood Media);

- Count VI: Breach of Contract (against Mood Media);

- Count VII: Unjust Enrichment (against Stingray and Mood Media);

- Count VIII: Common Law Fraud (against Stingray and Mood Media); and

- Count IX: Unfair Competition under FDUPTA (against Stingray and Mood Media).

In the pending Motion, Plaintiffs seek to gain a preliminary injunction against the Defendants because they urgently now need to "stop Defendants from continuing to misappropriate Plaintiffs' trade secrets, infringing Plaintiffs' patents, and using Plaintiffs' confidential information. This motion is narrowly tailored to enjoin Defendants' use of Stingray's UbiquiCAST OSE2 server that runs software using Plaintiffs' misappropriated trade secrets, patented technology and confidential information as well as enforce the NDA between Plaintiffs and Stingray as Mood Media/DMX's successor-in-interest." [D.E. 89 at 4].

Defendants oppose the motion on numerous substantive and procedural grounds.  One such argument is that Plaintiffs can never satisfy their burden of showing irreparable harm given their extreme delay in filing this action and seeking this relief.  Specifically, they argue that even if Plaintiffs could show a likelihood of success with respect to the claims presented in the motion their relief is limited to an action at law for damages because "Plaintiff waited almost ten years since discovering Defendant's alleged trade secret misappropriation before bringing [t]his lawsuit.

Similarly, Plaintiff's first Asserted Patent was granted on July 12, 2019, and he accused Stingray of infringement on April 20, 2021. . . . 'Delay in bringing an infringement action and seeking a preliminary injunction are factors that could suggest that the patentee is not irreparably harmed by the infringement.' *Apple, Inc. v. Samsung Elecs. Co.,* 678 F.3d 1314, 1325 (Fed. Cir. 2012). Even delays of less than two years are adequate to find that the plaintiff has suffered no irreparable harm. *See High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.,* 49 F.3d 1551, 1557 (Fed. Cir. 1995) ('Absent a good explanation, not offered or found here, 17 months is a substantial period of delay that militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.')."

Plaintiffs reply that this staleness argument lacks merit because "Plaintiffs brought their claims against Defendants upon discovery of those claims. Any delay in bringing this lawsuit was due to Defendants' actively preventing Plaintiffs from discovering Plaintiffs' claims against Defendants. . . . Plaintiffs also were unable to bring suit due to financial constraints, including fighting infringement of Plaintiffs' patent rights against other infringers, including Verizon, and in June of 2023, AT&T, and overcoming the adverse impact of COVID-19 on Plaintiffs' business." [D.E. 160 at 8].

## II.   APPLICABLE LAW AND PRINCIPLES

To obtain a preliminary injunction, a movant must demonstrate the following: "(1) a substantial likelihood of success on the merits of the underlying case; (2) the

movant will suffer irreparable harm in the absence of an injunction; (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002); *Revision Mil. Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525 (Fed. Cir. 2012).

A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the "burden of persuasion" as to the four requisites. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1568 (Fed. Cir. 1993) (award of "a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted."); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("Because a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion").

However, "[i]f the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *1-800 Contacts*, 299 F.3d at 1247 (citing *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001)).  Similarly, "a trial court need not make a finding on a movant's likelihood of success on the merits if it affords the movant the benefit of the presumption of irreparable harm and properly finds that presumption rebutted by the non-movant." *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996).

The goal of a preliminary injunction is to prevent irreparable harm and to "preserve the district court's power to render a meaningful decision after a trial on the merits." *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). "[T]he most compelling reason in favor of [granting a preliminary injunction] is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." *Id.* at 573; *see also Cont'l Serv. Grp., Inc. v. United States*, 722 F. App'x 986, 994, 2018 WL 388634, at *5 (Fed. Cir. Jan. 12, 2018) ("[t]he function of preliminary injunctive relief is to preserve the status quo pending a determination of the action on the merits.") (citing *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984)).

**W**hen an injunction does more than preserve the status quo, however, an even stronger showing is required. *See, e.g., Miami Beach Fed. Sav. & Loan Ass=n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958) ("A mandatory injunction . . . especially at the preliminary stage of proceedings, should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party."); *United States v. Board of Educ. of Green County, Miss.*, 332 F.2d 40, 46 (5th Cir. 1965) ("[M]andatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds").

### III.   ANALYSIS

Irreparable harm is the "*sine qua non* of injunctive relief." *Siegel*, 234 F.3d at 1176 (quoting *Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).   Thus even when movants establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper.  *See Siegel*, 234 F.3d at 1176 (citing *Snook v. Trust Co. Of Georgia Bank of Savannah, N.A.,* 909 F.2d 480, 486 (11th Cir. 1990) (affirming denial of a preliminary injunction even though plaintiff established a likelihood of prevailing because plaintiff failed to meet the burden of proving irreparable injury)); *see also United States v. Lambert,* 695 F.2d 536, 540 (11th Cir. 1983) (affirming denial of preliminary injunction and stating that a plaintiff's "success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm").

That is also true with respect to injunctions premised on patent infringement claims.  "Under our jurisprudence, in order to obtain a preliminary injunction, the movant must establish at the very least *both* of the first two factors, i.e., a likelihood of success on the merits and irreparable harm." *Novo Nordisk A/S v. Bio-Tech. Gen. Corp.*, 52 F. App'x 142, 143 (Fed. Cir. 2002) (citing *Amazon*, 239 F.3d at 1350).  Thus if the showing of irreparable harm is deficient, then injunctive relief is properly denied on that basis alone even though the Federal Circuit follows a rule that irreparable harm is presumed if a likelihood of infringement and patent validity exists. *See, e.g, Amazon,* 239 F.3d at 1350.  That is because the presumption of harm

is a rebuttable one, on bases such as delay in prosecuting the injunction, prior agreements to license the technology, or willingness to accept monetary damages. *See, e.g., Cordis Corp. v. Boston Sci. Corp.,* 99 F.App'x 928, 933 (Fed. Cir. 2004) (affirming denial of preliminary injunction where "the district court did not err in finding [defendant] adequately rebutted the presumption of irreparable harm.").

Here, Plaintiffs summarily claim that they can satisfy the burden of establishing irreparable harm as to their patent infringement claims, trade secret claims, and breach of contract claims.  Plaintiffs conclusorily claim that "Plaintiffs' trade secrets misappropriation claim consists of trade secrets used until they were later patented and published on June 30, 2016 in a foreign (PCT) application . . . and those that were never patented and remain Plaintiff's trade secrets. . . . For those trade secrets that were later patented, Plaintiffs' patent infringement claim charts show how Defendants misappropriated Plaintiffs' trade secrets before they were patented and how Defendants infringe the Asserted Patents once they issued." [D.E. 89 at 5].

We will assume for the sake of argument that these broad contentions will satisfy their burden of showing likelihood of success.  That assumption, however, is quite charitable.  As to the trade secrets claim, for instance, Defendants have asserted a statute of limitations defense that seems to squarely apply here.  Though we have recommended denial of the motion to dismiss on that ground because the defense injects various fact issues in the dispute that fall outside the scope of the pleadings, for purposes of injunctive relief it is hard to see how Defendants will not prevail based

on the record presented.  In 2014 Plaintiffs complained to the government officials as well as Defendants that Stingray was "illegally using our software and technology . . . and have access to our trade secrets." [D.E. 82-18].  Plaintiffs further claimed that Stingray "has access to our software in a server" that was "taken over illegally after a transaction made by Mood Media."  So given these accusations of wrongful use of trade secrets, Defendants' theory that the three-year statute of limitations was triggered at that point seems very well taken.  There is no dispute that Plaintiffs "discovered" the alleged misappropriation as of that date.  And to boot, even after expiration of the limitations period, Defendants waited an additional *seven years* to file the trade secrets claims.  Hence it would seem that the likelihood of any positive outcome in Plaintiffs' favor on these claims is in real doubt.  Plaintiffs' own equitable estoppel theory to oppose the limitations affirmative defense will require a Herculean effort.

Similarly, given the limitations included in Plaintiffs' patent applications to get past cited prior art, there are substantial questions whether the claims of the patents can be read onto Stingray's use of its on-screen enhancement technology.  And even if it could, there is record support here that Stingray began commercializing its technology in 2014 long before the patent applications at issue were filed.  So a slew of invalidity issues appear to stand in the way of Plaintiffs' successful assertion of patent infringement in this case.  *See, e.g., Amazon,* 239 F.3d at 1360 (reversing grant of preliminary injunction in part because it "remains to be learned whether there are other references that may be cited against the patent, and it surely remains to be

14

learned whether any shortcomings in [defendant's] initial preliminary validity challenge will be magnified or dissipated at trial.").

But, again, we will not delve further into these substantial issues because Plaintiffs' showing of irreparable harm is, not just dubious, but fatally flawed. We will thus assume that Plaintiffs can satisfy their burden of showing a likelihood of success on the merits.

One of the Defendants' arguments in opposition to the motion for preliminary injunction focuses on the untimeliness of this entire effort. Defendants' opposition is sustained by a vast amount of case authority in this Circuit and elsewhere that "the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1539 (11th Cir. 1989)).

The Federal Circuit follows a similar approach in patent cases. Though delay in prosecution a claim for injunction is but one factor in the analysis, it can be a dispositive factor in a given case. *See, e.g., High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,* 49 F.3d 1551, 1557 (Fed. Cir. 1995); *T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed. Cir. 1987) (affirming denial of preliminary injunction where movant failed to sustain burden of showing irreparable harm that had been rebutted by delay in seeking an injunction).

Delay in prosecuting an injunction comes in two forms. First, there is the delay in a plaintiff moving for injunctive relief after filing an action. Absent compelling reasons shown otherwise, an extended delay in moving for relief to address "irreparable harm" undermines that burden in the first instance. *See Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, No. 22-14257, 2023 WL 3704912, at *3 (11th Cir. May 30, 2023) (affirming denial of preliminary injunction in trademark infringement action because "the University delayed seeking a preliminary injunction for nearly six months after it initiated this action in January 2022. And when it did eventually file its motion for preliminary injunction, it failed to offer any reason for the delay and relied almost exclusively on evidence that was available to it when it filed its complaint.") (citing *Wreal,* 840 F.3d at 1248 (district court did not abuse its discretion in denying a preliminary injunction based on a five-month delay between the filing of the complaint and the motion for preliminary injunction)); *see, e.g., InVue Sec. Prods. Inc. v. Vanguard Prods. Grp., Inc.*, No. 8:18-CV-2548-T-33SPF, 2019 WL 4673755, at *1 (M.D. Fla. Aug. 15, 2019) (InVue's seven-month delay in moving for a preliminary injunction after the filing of this case rebuts InVue's claim of irreparable harm).

This type of delay undermining irreparable harm is not at issue in this case. Plaintiffs (while pro se) moved for a temporary restraining order at an early stage of the case, and timely renewed that effort through counsel after the Court initially denied it on procedural grounds and counsel's amended complaint was filed. [D.E. 18,

54, 83, 89]. So there can be no argument here that Plaintiffs unreasonably delayed in the filing of their motions for preliminary injunction once the action was filed.

What this case does present, however, is the second type of delay that is relevant in the irreparable harm analysis: the delay in the filing of the action itself after discovering infringing activity. *See, e.g., High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) (reversing grant of preliminary injunction in part because presumption of irreparable harm rebutted by seventeen-month delay in filing the action after patent in suit was reexamined and plaintiff was aware of defendant's alleged infringement); *Apple, Inc. v. Samsung Elecs. Co.,* 678 F.3d 1314, 1325 (Fed. Cir. 2012) ("[D]elay in bringing an infringement action and seeking a preliminary injunction are factors that could suggest that the patentee is not irreparably harmed by the infringement."); *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (affirming denial of preliminary injunction because plaintiff's "failure to seek injunctive relief [by filing the action] for a period of seventeen months . . . vitiates much of the force of [its] allegations of irreparable harm"); *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) (reversing grant of preliminary injunction in copyright infringement action where plaintiff who waited five months after a YouTube video was posted to seek to enjoin Google to take it down had not demonstrated irreparable harm); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276, 225 USPQ 708, 711 (2d Cir. 1985) (reversing grant of preliminary injunction in trademark infringement in part where nine-month delay in filing the action undercut claim of irreparable harm) ("Although a particular period

of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.").

Upon review of the record here, the presumption of irreparable harm for patent purposes, as well as the burden of showing irreparable harm otherwise, is fully rebutted/undermined by the extended delay in the filing of this lawsuit. Plaintiffs' own submissions and exhibits reveal that Dr. Hernandez waited almost *ten years* after discovering the alleged trade secret misappropriation before bringing his lawsuit. By that point, April 2014, he had discovered that DMX/Mood Media had purportedly breached their contractual obligations by making his trade secrets known and available to a stranger to their agreement – Stingray. And he also knew that, by doing so, Stingray was now gaining access to that trade secret information that could certainly injure Plaintiffs' proprietary interests. Yet, rather than filing a lawsuit, he entered into further negotiations and a settlement agreement for additional monies. That decision to pursue alternative remedies may have been fully understandable, especially given his financial condition at the time. But the point here is that these decisions negate any "irreparable harm" for purposes of enforcing his trade secrets and contractual rights now.

For instance, in *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1352 (S.D. Fla. 2002), plaintiff admitted to knowing of defendants' trademark violations in the summer of 2000. Yet, the plaintiff waited until November 9, 2000 to send a cease-and-desist letter. The plaintiff then waited until May 2, 2001

– nearly a full year after plaintiff admitted to knowing of defendant's activities – to file a lawsuit.  Judge Lenard found that "[e]ven getting giving Plaintiff credit for attempting to reach a settlement without litigation, there remain[ed] a three-month delay between [p]laintiff's last communication with [d]efendants and commencement of this suit." *Id.* at 1356.  As such, the court held that "Plaintiff's dilatory prosecution of its rights . . . vitiate[d] the notion of irreparable harm," that it "undercut any sense of urgency, and, therefore, [p]laintiff . . . failed to demonstrate sufficient need for a preliminary injunction." *Id.* (citing *Comic Strip, Inc. v. Fox Television Stations, Inc.,* 710 F. Supp. 976, 981 (S.D.N.Y. 1989)). *Seiko* is quite analogous because it illustrates how a party that delays in filing a complaint after a substantial amount of time "'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Citibank,* 756 F.2d at 277 (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.,* 478 F. Supp. 602, 609 (S.D.N.Y. 1979)); *see also Wells Fargo & Co. v. WhenU.com, Inc.,* 293 F. Supp. 2d 734, 771–72 (E.D. Mich. 2003) ("Although plaintiffs were aware of the alleged effects of SaveNow on their businesses as early as August, 2002, they delayed nine months before bringing a motion for injunctive relief.  Plaintiffs' delay in seeking a preliminary injunction undermines their allegation of irreparable harm.").

Applying that same persuasive rationale here, Plaintiffs' dilatory prosecution of their legal rights, knowing that Stingray and its affiliates had gained access to his trade secrets without his initial authorization, fully negates any showing of

irreparable harm.  *See also Pals Grp., Inc. v. Quiskeya Trading Corp.,* No. 16-23905-CIV, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) (denying preliminary injunction where one-year delay in filing action undermined showing of irreparable harm in trade secret and unfair competition action) ("Other courts (both in and outside the Eleventh Circuit) have held that unexplained delays of a few months negate any claim of irreparable harm on a preliminary injunction motion."); *Powell v. Home Depot U.S.A., Inc.,* No. 07-80435-CIV, 2009 WL 3855174, at *15 (S.D. Fla. Nov. 17, 2009) (denying preliminary injunction where "Plaintiff had no good explanation for waiting twelve months to file this suit with both an issued patent and knowledge of likely infringing activity in his possession. Second, Plaintiff did not explain why he was unable to file a preliminary junction earlier when Defendant did not produce any evidence supporting its defenses. Third, at the preliminary injunction stage evidence is nearly always incomplete and hence the 'likelihood of success' standard exists."); *Lanvin, Inc. v. Colonia, Inc.,* 739 F. Supp. 182, 192 (S.D.N.Y. 1990) (denying preliminary injunction after seven-month delay); *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) (finding that plaintiff first learned of an infringement in August of 1988 and that plaintiff did not commence a lawsuit until March 1989 constituted a dilatory prosecution of plaintiff's rights to obtain a preliminary injunction).

Note that this delay is not ten *months*, which would be reason enough to undermine the showing of irreparable harm.  But when measured against a delay in years, these cases seem to pale in comparison.  And even if we grant Plaintiffs the

benefit of the doubt that Defendants' assurances that led up to the signing of the 2014 settlement agreement lulled Plaintiffs into inaction, the record cannot possibly excuse the second delay in the record.  Plaintiffs then waited *over three years* after Dr. Hernandez had actual knowledge to "determine that Defendants were infringing his patents and using his trade secrets" in April of 2021. [D.E. 89 at 3-4.] Such a significant delay alone shows that Plaintiffs clearly did not consider any harm to be "actual and imminent" upon Plaintiffs' already-untimely discovery of the trade secret misappropriation and patent infringement. *Siegel,* 234 F.3d at 1176.  The latter part of that finding is clear because Plaintiffs' first Asserted Patent issued on July 12, 2019, and he first accused Stingray of infringement on April 20, 2021. [D.E. 82 at ¶ 110; D.E. 1 at ¶ 116]. Yet, no patent infringement action was then filed despite Plaintiffs being armed with their patents and their infringement theories.

Consequently, the multiple delays that we are dealing with here are truly in a league of their own.  Cases that have found irreparable harm to be negated by less than two-year delays illustrate just how untenable Plaintiffs' injunctive relief effort here is.  *See, e.g., High Tech,* 49 F.3d at 1557 ("Absent a good explanation, not offered or found here, 17 months is a substantial period of delay that militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."); *InVue Security,* 2019 WL 4671143, at *8-9 (recommending denial of preliminary injunction for lack of irreparable harm where the patentee waited 18 months to move for a preliminary injunction after notifying the accused infringer of the suspected infringement); *report and*

*recommendation adopted,* No. 8:18-CV-2548-T-33SPF, 2019 WL 4673755, *1-2 (M.D. Fla. Aug. 15, 2019) ("Plaintiff had no good explanation for waiting twelve months to file this suit with both an issued patent and knowledge of likely infringing activity in his possession").

This extended delay in prosecuting Plaintiffs' claims fully undermines the need for immediate relief. And even as to the patents, which if indeed infringed by Stingray's technology are presumed valid and presumed to constitute irreparable harm, that presumption is squarely rebutted. A level of delay involving years, not months, amounts to tangible and persuasive evidence that a plaintiff does not require injunctive relief pending trial. And, having that presumption rebutted, the burden then squarely falls back on the movant to show that, in fact, irreparable harm follows. Yet, here Plaintiffs make a very meager conclusory case for irreparable harm. Indeed, they are relying primarily on the presumption with little else. That is not enough under the circumstances.

For instance, with respect to the patent claims, neither Plaintiffs' Complaint nor the briefing on the motion supports a finding that Plaintiffs currently offer products or services in competition with the Stingray music streaming service. That is meaningful because "lack of commercial activity by the patentee is a significant factor" in determining whether the patentee has suffered irreparable harm. *E.g., High Tech.,* 49 F.3d at 1556. Preliminary injunctive relief is deemed less necessary where the patentee does not practice the patent or participate in commercial activity related to the patent. *See, e.g., ARX Fit, LLC v. Outstrip Equip., LLC, No.* 1:18-CV-

848-RP, 2019 WL 3412917, at *2 (W.D. Tex. Jul. 29, 2019) ("Because [Plaintiff] is not selling anything and can reduce any sales it loses during the pendency of this litigation to damages, it has not carried its burden to show that it is likely to be irreparably harmed in the absence of a preliminary injunction."). And here Plaintiffs' only allegation that they compete with Stingray is that they allegedly "provided Brazilian DTH Sky with services for the distribution of its audio music channels." [D.E. 89 at 8]. Yet, by their own admission Brazilian DTH Sky canceled those services five years ago in 2019. So even if Plaintiffs did suffer the loss they allege, Plaintiffs' lengthy delay in bringing this suit clearly illustrates that they are not, in fact, at risk of "actual and imminent" injury. *See, e.g., Apple,* 678 F.3d at 1325 ("As the Supreme Court has pointed out, a party seeking injunctive relief must make 'a clear showing' that it is at risk of irreparable harm, . . . which entails showing 'a likelihood of substantial and immediate irreparable injury'") (citation omitted).

Relatedly, Plaintiffs have also not offered any evidence that they even could compete with Defendants. While Plaintiffs' allegations target Stingray's music streaming service, they have not pointed us to evidence that they have any license or other rights to any of the content (i.e., music) that Stingray provides. Without licenses for this type of content, it is hard to find that Plaintiffs could compete with Stingray or provide a similar service to any of Stingray's customers. That, too, undermines the case for irreparable harm if preliminary injunctive relief was not available. When coupled with the monumental delay in the record before seeking any judicial relief against Stingray and the Defendants, a finding of irreparable harm is simply not

possible. *See also Apple,* 678 F.3d at 1324 (affirming denial of preliminary injunction due to delay in prosecuting patent infringement claims once patent issued as well as lack of showing of tangible harm; "We hold that the district court was correct to require a showing of some causal nexus between Samsung's infringement and the alleged harm to Apple as part of the showing of irreparable harm. To show irreparable harm, it is necessary to show that the infringement caused harm in the first place. Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature.").

Finally, apart from all these headwinds in the record, Plaintiffs' claim of irreparable harm is also undercut by other parts of the record that show that they have previously offered to license their technology to Stingray. [D.E. 82 at ¶¶ 84-90]. Dr. Hernandez admits that he offered to license "his patent portfolio" including "all source code" to Stingray and held discussions, after obtaining two of his three patents between 2017 and 2019, with Stingray in an attempt to license his intellectual property. [D.E. 82 at ¶¶ 87-89]. Only after engaging in this process did Plaintiffs file this lawsuit after an additional five years passed by.  Again, an admitted part of the record negates the showing of irreparable harm that is the "sine qua non" of the relief requested here.

Similarly, and even more fatally, the record shows that on April 20, 2021, Plaintiffs delivered to Stingray a formal cease-and-desist letter accusing Stingray of infringing the '074 and '002 Patents. [D.E. 3-6 at 95]. In this letter, Plaintiffs explicitly offered to license its intellectual property for a monetary royalty, stating

unequivocally that "[a] 12% royalty is fair and acceptable to EGLA Corp." [D.E. 3-6 at 103]. At the same time, the letter warned that an infringement claim would follow if no agreement was reached because they "have solid evidence of this gross misappropriation, including details of your platform with numerous examples, and also how your customers are still using it. Moreover, our investigation cross-referenced other cybersecurity websites, as well as publicly (readable) available information found in several dockets located in the Federal District Court in E.D. of Texas." [D.E. 3-6 at 96]. Plaintiffs then warned that, if no royalty agreement was entered into, they would sue for fraud, trade secret infringement, and patent infringement, and would "let our legal team take over and file all the identified evidence appropriately with US Federal authorities, ITC, and any legal means in our power to protect our interest." [D.E. 3-6 at 103].

This record evidence cannot be overcome for purposes of this motion. Plaintiffs were admittedly aware of all their available rights and the cause to sue Stingray and Defendants for infringement, fraud and breach of contract. But they alternatively offered a royalty agreement to satisfy their existing claims. Such acknowledgements show that monetary compensation was the preferred remedy for the alleged infringement and misconduct. That is antithetical to a showing of irreparable harm required for injunctive relief now. *See High Tech,* 49 F.3d at 1556 (reversing district court grant of preliminary injunction where "the evidence shows that plaintiff] offered a license to [defendant], so it is clear that [plaintiff] is willing to forgo its patent rights for compensation"); *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.,* 694

F.3d 1312, 1340 (Fed. Cir. 2012) (reversing grant of permanent injunction for lack of showing of irreparable harm; "To be clear, we are not holding that any time a patentee offers a license to the defendant, it will be unable to secure an injunction. We conclude only that in light of the record in this case, which shows extensive licensing, licensing efforts, solicitation of the defendant over a long period of time preceding and during litigation, and no direct competition between Verizon and ActiveVideo, it was clearly erroneous for the district court to conclude that money damages would not adequately compensate ActiveVideo for Verizon's infringement.").

Additionally, the fact that Plaintiffs accepted substantial funds ten years ago in exchange for releasing their trade secret infringement and breach of contract claims against Stingray's affiliates further illustrates that there is no "irreparable" harm and that money damages are enough to compensate for any harms allegedly suffered.  When this record evidence is coupled with the ten-year delay in asserting a damages and equitable claim for trade secret infringement, compounded by a three-year delay in asserting the additional patent infringement claims that accrued according to Plaintiffs in 2021, the case for irreparable harm crumbles.  In other words, we do not rely alone on the years-long delay that is self-evident in this record. That extended delay, coupled with other factors that negate a showing of irreparable harm on the merits, make it impossible for the Court to find that this essential element of the claim has been met.

Finally, we reject as utterly unpersuasive the excuses offered in Plaintiffs' reply for not asserting their rights sooner.  Plaintiffs' financial wherewithal to pursue

Stingray and the Defendants may indeed have been a reason why they preferred to negotiate a deal back in 2014.   But the fact Plaintiffs accepted additional compensation to resolve their then existing claims of trade secret and contract violations fully supports Defendants' opposition to this motion.   Irreparable harm does not exist when monetary compensation suffices.

Similarly, Plaintiffs' claim that, once their 2018 and 2019 patents issued and they discovered Stingray's actual use of their technology, they were unable to file suit then because they had other fish to fry rings quite hollow.  It is certainly possible that those infringers had worse cases than Stingray, or otherwise presented a greater threat of irreparable harm to Plaintiffs, such that it was a wise strategic decision to pursue those infringers.  So, in other words, those cases may have generated actual irreparable harm as opposed to this one.  But to not file the action shortly thereafter, at least by 2022, is antithetical to the argument now, in 2024, that irreparable harm is being suffered.  And to add to that the idea, that the COVID pandemic made timely asserting one's rights impossible, is simply not tenable.  Litigation did not end with COVID; to the contrary, more efficient and less expensive means of litigation arose. They would certainly have been available to Plaintiffs had such efforts been pursued. At the very least, if irreparable harm was in fact at play, Plaintiffs could have instituted the action and, after succeeding in obtaining temporary injunctive relief if warranted, they could have then sought a delay in the final outcome of the litigation to allow their resources to catch up.  That too was not pursued.

So, in short, Plaintiffs' effort here is belied by literally every decision they have undertaken since 2014.  For them to argue now that immediate action is urgently required has little resonance.  On the plain record presented, even without an evidentiary hearing, it is evident that Plaintiffs cannot satisfy their heavy burden, especially once Defendants have thoroughly rebutted any presumption of harm that may have existed in the case.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' Second Renewed Motion for Preliminary Injunction [D.E. 82] lacks merit and is **DENIED** on their predicate failure to establish irreparable harm in this record.

Because the Court is not entering any dispositive relief, the motion is adjudicated by Order for administrative reasons.  Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, however, if any appeal is filed from this Order to the District Judge, Plaintiffs' right to request de novo is preserved, as in that case they can treat this Order as a Report and Recommendation and appeal under Rule 4(b).  But failure to timely file an appeal/objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered herein.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE and ORDERED** in Chambers at Miami, Florida this 10th day of

March, 2025.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge