IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:24-CV-21226-RAR

DR. EDWIN A. HERNANDEZ and
EGLA CORP.,

    *Plaintiffs*,

    v.

STINGRAY GROUP, INC. f/k/a
STINGRAY DIGITAL GROUP, INC.,
STINGRAY MUSIC USA, INC.,
MOOD MEDIA LLC f/k/a MOOD
MEDIA CORPORATION, AT&T
ENTERPRISES, LLC f/k/a AT&T
CORP., MILLICOM
INTERNATIONAL SERVICES, LLC,
and BLUE STREAM
COMMUNICATIONS, LLC dba BLUE
STREAM FIBER,

    *Defendants*.

**JURY TRIAL DEMANDED**

---

**DEFENDANT STINGRAY MUSIC USA, INC.'S
ANSWER AND AFFIRMATIVE DEFENSES**

---

Defendant Stingray Music USA, Inc. ("Stingray Music") responds to Plaintiffs' Dr. Edwin A. Hernandez and EGLA CORP.'s (collectively, "Plaintiffs") Fourth Amended Complaint (Dkt. 259).[1]

---

[1] The Fourth Amended Complaint identifies additional parties as follows: Stingray Group, Inc. f/k/a Stingray Digital Group, Inc. ("Stingray Group"), Stingray Group and Stingray Music (collectively, "Stingray"), Mood Media LLC f/k/a Mood Media Corporation ("Mood Media"), AT&T Enterprises, LLC f/k/a AT&T Corp. ("AT&T"), Millicom International Services, LLC ("Millicom"), and Blue Stream Communications, LLC d/b/a Blue Stream Fiber ("Blue Stream"). Dkt. 259 at 2.

The numbered and unnumbered paragraphs of the Fourth Amended Complaint are reproduced below, followed by Stingray Music's responses. The headings in the Fourth Amended Complaint are reproduced for convenience, and to the extent the headings contain factual and legal characterizations, Stingray Music denies them. Any allegation that Stingray Music does not expressly admit is denied.

<u>**INTRODUCTION**</u>

1.      This case arises from the theft of Plaintiffs' proprietary technologies (trade secrets and patented technology) used in the distribution of music channels to millions of subscribers in the United States and around the world, included but not limited to "Stingray Music" service to subscribers of AT&T, Millicom, Blue Stream, and DOES 1-100.

**<u>RESPONSE</u>**: Stingray Music admits that Plaintiffs have sued Stingray Music and other defendants for trade secret misappropriation, patent infringement, and breach of contract, but expressly denies allegations or implications of theft of Plaintiffs' proprietary technologies or other wrongdoing, and otherwise denies the allegations in Paragraph 1.

2.      From about 2012 through 2014, Dr. Hernandez developed technology to deliver audio and video content using cloud-based platforms and mobile applications using secure remote servers. During this time, this technology was maintained as Dr. Hernandez's trade secrets. Later, some of this technology was disclosed in Dr. Hernandez's patent applications, which ultimately resulted in patents-at-issue, namely, U.S. Patent Nos. 10,127,074; 10,524,002 and 11,140,441 ("Asserted Patents") (**Exhibits 1-3**). However, prior to the publication of the patented technology on June 30, 2016, they remained Dr. Hernandez's trade secrets. Technology that was not disclosed in the Asserted Patents remains Dr. Hernandez's trade secrets.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2, as they do not pertain to Stingray Music, and denies them on that basis.

3.      The Stingray defendants acquired unauthorized access to Dr. Hernandez's proprietary technology in connection with the acquisition of certain assets of Defendant Mood Media, who was using Dr. Hernandez's proprietary technology under an agreement with Dr. Hernandez's company EGLA CORP. Stingray's unauthorized use of Dr. Hernandez's trade secrets and patented technology allowed Stingray to replace competitors such as Music Choice to become the leading provider of music services to Cable TV operators with music channels offerings to over 700 operators worldwide (**Exhibit 4** at 2[1]) at Dr. Hernandez's expense.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 3.

4.      Ultimately, from 2014 to 2024, Stingray increased its revenues from C$15M to C$100.4M[2] per quarter, and increased its customer base to at least 413 operators, including Defendants AT&T, Millicom, and Blue Stream (**Exhibit 4** at 2), generating US $37.1 million per quarter in revenues the United States.[3]

**RESPONSE**: Stingray Music admits that its overall revenue generally increased in the years prior to 2024 and otherwise denies the allegations in Paragraph 4.

5.      In December 2014, Dr. Hernandez filed for patent protection for certain of his technological innovations and has received approval of 94 claims spread across 4 U.S. patents and 8 claims in an European Patent covering 17 jurisdictions, patents that are infringed or were infringed by Defendants.

**RESPONSE**: Stingray Music denies that it infringes or infringed any patents owned by Dr. Hernandez. Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 5, which are denied on that basis.

### BACKGROUND

6.     In or around 2012, a company called "DMX Music" was having financial troubles and used approximately 50 desktop computers to broadcast music-only content to cable operator affiliates. DMX relied on satellite delivery systems and antiquated hardware and software. DMX management at the time met with Dr. Hernandez to see if something could be done. Dr. Hernandez suggested a different approach for DMX's music delivery, including a project to develop an "alternative" solution to satellite delivery. Dr. Hernandez proposed developing a new technology using cloud-based platforms and mobile applications, provided that this technology remained exclusively Dr. Hernandez's proprietary technology. DMX agreed. As DMX didn't have a budget, Dr. Hernandez began developing this technological platform in multiple phases and multiple products, and DMX agreed to provide its clients as "testbed" for those technological solutions.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, as they do not pertain to Stingray Music, and denies them on that basis.

7.     However, before disclosing any technical information, Dr. Hernandez and his company EGLA CORP entered a Non-Disclosure Agreement ("NDA") on March of 2012 with DMX (**Exhibit 5**), and subsequently disclosed confidential and proprietary strategies, architecture documents, and software strategies to be used by Dr. Hernandez.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, as they do not pertain to Stingray Music, and denies them on that basis.

8.     The NDA explicitly recited that "[n]o licenses or rights under any patent, copyright, or trade secret" were granted or were implied with the agreement.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8, as they do not pertain to Stingray Music, and denies them on that basis.

9.     Dr. Hernandez's research and development included a web-based cloud platform, that DMX called DMX2GO, as well as prototype audio box devices for commercial music customers, mobile applications including "Mediamplify Music," and servers to replace satellite delivery with internet-based transport for the existing audio-only platform.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9, as they do not pertain to Stingray Music, and denies them on that basis.

10.     The associated web-based products and mobile application technologies developed by Dr. Hernandez were demonstrated to DMX and DMX used those products to revamp sales.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, as they do not pertain to Stingray Music, and denies them on that basis.

11.     Beginning in 2013, Dr. Hernandez hired services to host his streaming platform, including iWeb (**Exhibit 6**), Equinix data centers (**Exhibit 7**), and other providers.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11, as they do not pertain to Stingray Music, and denies them on that basis.

12.     As part of the development of the technology, Dr. Hernandez shipped several servers that contained music and audio-only prototype solution and installed at cable TV head-end operators including CABLEMAS, CABLEVISION, AXTELTV, ENCOMPASS, and others.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12, as they do not pertain to Stingray Music, and denies them on that basis.

13.     Among the many proprietary disclosures, Dr. Hernandez presented to then DMX Media General Managers and executives, Gustavo Tonelli and Alejandro Cacciola, confidential technical documents, server plans, technology updates, access to cable operators that were needed in order to perfect and test Dr. Hernandez's developments.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13, as they do not pertain to Stingray Music, and denies them on that basis.

14.     To replace antiquated hardware encoders and wiring, a server-based solution was envisioned by Dr. Hernandez to deploy a software-defined system to each Cable Operator. To solve this problem, Dr. Hernandez proposed a software-defined solution to replace hardware encoders and satellite delivery, which was novel and innovative at the time.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14, as they do not pertain to Stingray Music, and denies them on that basis.

15.     In or around March of 2012, DMX was acquired by Defendant Mood Media for $86.1M cash (**Exhibit 8**) and the nascent relationship between DMX and Dr. Hernandez was formalized with Mood Media. Post-acquisition Mood Media continued using the DMX brand and platform ("Mood Media/DMX"), which included several of Dr. Hernandez's ongoing projects and intellectual property using web-based technologies and mobile applications, including DMX2GO (Web-based), Mediamplify Music Mobile App, DMX2GO Widgets, and other Set-Top-Box projects.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15, as they do not pertain to Stingray Music, and denies them on that basis.

16.     Dr. Hernandez was the main software developer, architect, solo entrepreneur, test engineer, and sole provider of technologies for Mood Media, and started deploying several versions of his software and conducted testing and integration at different major Cable TV systems (e.g., DirectTV in California, Cablevision in Mexico City) where Mood Media/DMX had clients to test the solutions using real head ends that connected end-users with Set Top Boxes (STB).

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16, as they do not pertain to Stingray Music, and denies them on that basis.

17.     As noted, the first version of Dr. Hernandez's software was music-only and did not deliver visual assets. It was not until mid-2013, when Dr. Hernandez developed his first prototype, wrote a specification, and implemented a python-based software to manage HTML-based screen enhancements for Cable TV and Satellite Operators. Dr. Hernandez finalized all this work in or around May 2014.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17, as they do not pertain to Stingray Music, and denies them on that basis.

18.     As explained below, Defendants used, and continue to use, Dr. Hernandez's trade secrets and patented technology to offer streaming audio and music services to millions of subscribers in the U.S. and worldwide.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 18.

## PARTIES

19.     Plaintiff Dr. Edwin A. Hernandez, a native of Honduras, is a resident of Coral Springs, Florida. Dr. Hernandez is an inventor and entrepreneur that has owned a technology incubator and accelerator, called EGLAVATOR, from 1997 to 2023. The EGLAVATOR was a 10,000 sq ft. facility was in Boca Raton, FL. Dr. Hernandez was Fulbright scholar and named inventor and owner of 15 issued U.S. and foreign patents. Dr. Hernandez spends his time helping entrepreneurs to launch technological startups with technical leadership, oversight, and capital. Dr. Hernandez is a member of the board of advisers, a reviewer for international journals and technical publications, and is the biggest shareholder of several entities, and main founder of EGLA CORP and the inventor of the patents-at-issue.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, as they do not pertain to Stingray Music, and denies them on that basis.

20.     Plaintiff EGLA CORP is a Florida corporation with its principal place of business at 4890 NW 101st Ave Coral Springs, FL. EGLA CORP is owned by Dr. Hernandez and his

parents (Dr. Alcides Hernandez and Reina Gladys Hernandez), and the company has an exclusive license to the technologies owned by Dr. Hernandez.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20, as they do not pertain to Stingray Music, and denies them on that basis.

21.     On information and belief, Defendant Stingray Group is a Canadian corporation with its principal place of business at 730 Wellington Street, Montreal, Quebec, Canada H3C 1T4. Stingray Group currently has over 250 employees across the world. Stingray Group is doing business in the United States, in the State of Florida, and in this judicial district.

**RESPONSE**: Stingray Music admits that Stingray Group is a Canadian corporation with its principal place of business at 730 Wellington Street, Montreal, Quebec, Canada H3C 1T4, and denies the remaining allegations in Paragraph 21.

22.     On information and belief, Defendant Stingray Music is a Delaware corporation with its principal place of business at 2127 Ayrsley Town Blvd., Suite 202, Charlotte, North Carolina 28273. Stingray Music is doing business in the United States, in the State of Florida, and in this judicial district.

**RESPONSE**: Stingray Music admits that it is a Delaware corporation doing business in the United States and the State of Florida and denies the remaining allegations in Paragraph 22.

23.     On information and belief, Defendant Mood Media LLC f/k/a Mood Media Corporation is a Texas corporation located at 2100 S. IH 35, Suite 201, Austin, TX 78704. Mood Media is doing business in the United States, in the State of Florida, and in this judicial district.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23, as they do not pertain to Stingray Music, and denies them on that basis.

24.     On information and belief, Defendant AT&T Enterprises, LLC f/k/a AT&T Corp. is a New York corporation with offices at 20445 Biscayne Blvd, Suite H1, Aventura, FL, 33180 and its principal place of business at One AT&T Way, Bedminster, New Jersey 07921-0752. AT&T Corp.'s registered agent for service is CT Corporation System, 28 Liberty Street, New York, New York, 10005. AT&T is doing business in the United States, in the State of Florida, and in this judicial district.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24, as they do not pertain to Stingray Music, and denies them on that basis.

25.     On information and belief, Defendant Millicom International Services, LLC is a Florida limited liability company with a principal place of business in Miami, FL at 255 Giralda Ave, Suite 800 Coral Gables, FL 33134. Millicom is doing business in the United States, in the State of Florida, and in this judicial district.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, as they do not pertain to Stingray Music, and denies them on that basis.

26.     On information and belief, Defendant Blue Stream Communications, LLC is a Delaware limited liability company with a principal place of business at 12409 NW 35 St Coral Springs, FL 33065. Blue Stream is doing business in the United States, in the State of Florida, and in this judicial district.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, as they do not pertain to Stingray Music, and denies them on that basis.

27.     Plaintiff is unaware of the true names or capacities, whether individual, corporate, associate, or otherwise of defendants DOES 1 through 100, inclusive. Plaintiff therefore sues said defendants by such fictitious names. Plaintiff will amend this Complaint to show their true names or capacities when the same have been ascertained.

**RESPONSE**: Paragraph 27 includes statements that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 27.

## JURISDICTION AND VENUE

28.     This is an action for (a) trade secret misappropriation under both the Defend Trade Secrets Act, now codified at 18 U.S.C. § 1836 et seq. ("DTSA"), and Florida Uniform Trade Secrets Act, Fl. Stat. § 201 *et seq*., (b) patent infringement under the patent laws of the United States, 35 U.S.C. § 100 *et seq*., and (c) breach of contract.

**RESPONSE**: Stingray Music admits that the Fourth Amended Complaint purports to assert causes of action for (a) trade secret misappropriation under both the Defend Trade Secrets Act, now codified at 18 U.S.C. § 1836 et seq. ("DTSA"), and Florida Uniform Trade Secrets Act, Fl. Stat. § 201 *et seq*., (b) patent infringement under the patent laws of the United States, 35 U.S.C. § 100 *et seq*., and (c) breach of contract. Answering further, Stingray Music denies any wrongdoing, denies that Plaintiffs are entitled to any relief against Stingray Music at law or in equity, and otherwise denies the allegations in Paragraph 28.

29.     This Court has subject matter jurisdiction over patent claims in this action pursuant under 18 U.S.C. § 1836(c) (actions arising under the DTSA), 28 U.S.C. §1338(a) (patent

infringement), 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1367 (supplemental jurisdiction); and the doctrines of ancillary and pendent jurisdiction.

**RESPONSE**: Stingray Music admits that the Fourth Amended Complaint purports to assert federal causes of action under 18 U.S.C. § 1836(c) and 28 U.S.C. § 1338(a) and denies the remaining allegations in Paragraph 29.

30.     This Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Dr. Hernandez resides in this district and a substantial part of the events giving rise to the claims occurred in this district, pursuant to 28 U.S.C. § 1400(b) because the domestic Defendants have a regular place of business in this District and committed acts of infringement here, and pursuant to 28 U.S.C. § 1391(c)(3) as to foreign Defendant Stingray Group. Dr. Hernandez is informed and believes and alleges thereon that Defendant Stingray Group is a foreign corporation with no offices in the United States, and Defendant Millicom International Services, LLC is a Florida limited liability company with a principal place of business in Miami, FL at 255 Giralda Ave, Suite 800 Coral Gables, FL 33134. Defendant Blue Stream Communications, LLC is a Delaware limited liability company with a principal place of business at 12409 NW 35 St Coral Springs, FL 33065. Dr. Hernandez is informed and believes and alleges thereon that these Defendants have committed acts of infringement in this District, including using, distributing, promoting, marketing, selling, offering for sale, importing, and/or advertising their infringing products and services in or to this District and/or to businesses and individuals in this District. Dr. Hernandez is further informed and believes and thereon alleges that these Defendants derive substantial revenue from using, distributing, promoting, marketing, selling, offering for sale, importing of their infringing products and services in, or to users in, this District. Dr. Hernandez is informed and believes and thereon alleges that

Defendants Stingray Music and Mood Media do business in the state of Florida and this judicial

district, a substantial part of the events giving rise to the claims against Stingray Music and Mood

Media occurred in this district, and harmed Plaintiffs who are residents of Florida and reside in

this judicial district.

**RESPONSE**:  Stingray Music denies the allegations in Paragraph 30.

### FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

A.      **Dr. Hernandez's Background**

31.      Dr. Hernandez is a Ph.D. in Computer Engineering from the University of Florida

and an inventor of 15 issued patents. Dr. Hernandez is an innovator and in 2017 founded his startup

accelerator and incubator, the EGLAVATOR. His incubator has developed and invented multiple

devices and launched several companies. Dr. Hernandez continues to develop technological

advancements and recently filed for a new patent application for MEVIAOS, a decentralized

multimedia operating system, the evolution of MEVIA.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 31, as they do not pertain to Stingray Music, and

denies them on that basis.

32.      Among his patent portfolios, Dr. Hernandez has licensed some of his inventions to

mobile carriers, phone manufacturers, including Verizon Wireless, through his company Mobility

Workx, LLC.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 32, as they do not pertain to Stingray Music, and

denies them on that basis.

33.     Dr. Hernandez also works as an expert witness for patent, trade secret, and technology intellectual property cases, and has testified in trial, and deposed dozens of times for high-profile litigations.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33, as they do not pertain to Stingray Music, and denies them on that basis.

34.     The patents at issue here do not include many aspects of Dr. Hernandez's streaming platform and R&D existing around 2013 and 2014, including Dr. Hernandez's work on:

A. iWEB cloud and multimedia streaming cloud APIs and streaming for web,

B. Mobile Applications with Music Streaming and Video,

C. Multimedia CDN and Cloud Storage (e.g., Huladrive),

D. APIs for metadata and music information from the server(s) and used by the mobile applications, and

E. Music-only streaming to Cable TV operators.

These aspects remain Dr. Hernandez's trade secrets.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34, as they do not pertain to Stingray Music, and denies them on that basis.

35.     The Asserted Patents cover 94 issued claims that include streaming broadcasting of unicast and multicast systems, where the source of the generated content is HTML, multimedia files, and broadcasting platforms. In simple terms, one of the aspects of the Asserted Patents is the generation of visual representations with background images generated using web-based elements that are already used in mobile applications creating a unified user experience. The screens

displayed in set top boxes or Smart TVs are generated with images, html, and styles from a web page that are displayed and broadcasted in a multicast address, which is compatible with MVPD operators (*e.g.*, AT&T, Millicom's TIGO, etc.).

**RESPONSE**: Stingray Music denies the allegations in Paragraph 35.

36.     The Asserted Patents also cover the use of virtual machines, headless browsers, m3u8 streaming, fault-tolerance, MPEG-based multiplexers, use of caching units, multicast servers, unicast servers, CSS, HTTP, JSON, H.264 encoders, MPEG2Video encoders, among other innovations.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 36.

**B.     Dr. Hernandez's Development of his Proprietary Technology, Including his Trade Secrets**

37.     Since 2010, Dr. Hernandez has, and continues to, develop, architect, and implement cloud-based platforms for multimedia delivery.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37, as they do not pertain to Stingray Music, and denies them on that basis.

38.     Dr. Hernandez's technologies are required to distribute music content where, instead of having one computer per music channel, all channels are generated and encoded from a single arrangement, including backup systems, that can be implemented with 2 or 3 servers. Additionally, configuration, management, and adaptability of the system are software-driven instead of depending on hardware changes.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 38.

39.     Before implementing Dr. Hernandez's technology, DMX used 50 desktop servers with ASI (Asynchronous Serial Interface) cards that were interconnected to a set of multiplexers

and encoders that ultimately were delivered to a satellite system and managed by Digital Latin America (DLA) from Coral Springs, FL. In general, most of the industry used these methods, including DMX competitors Music Choice, Galaxy, and others.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39, as they do not pertain to Stingray Music, and denies them on that basis.

40.    In and around early 2010, Dr. Hernandez invested his own personal funds developing and investing in cloud platforms, a cluster-filesystem called HULADRIVE, and testbeds. These were integrated in an efficient and cost-effective way using open-source tools such as FFMPEG to work with the early-stage formats that were being developed at that time.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, as they do not pertain to Stingray Music, and denies them on that basis.

41.    The first set of technologies developed were streamers and cloud-based systems to stream a set of music channels (*e.g.*, 100) and provide a link for web applications, mobile applications, and web-based platforms. Dr. Hernandez provided Application Programming Interfaces (API) to retrieve metadata from any of the music channels.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41, as they do not pertain to Stingray Music, and denies them on that basis.

42.    Around 2012 to 2013, Dr, Hernandez developed an audio-only broadcasting platform for cable operators and replace satellite delivery that was delivered from a server without using hardware encoders and was compatible with cable TV Set Top Boxes. The audio-only

streaming solutions was designed in several ways using several streaming protocols. The vision was to develop a new platform that integrated existing web-widgets, javascripts, and Cascade Style Sheets (CSS) to provide a graphical User Experience (UX) with metadata and high-quality music content.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42, as they do not pertain to Stingray Music, and denies them on that basis.

43.     Around 2013, Dr. Hernandez further investigated how to generate, not only audio streams, but incorporate visual components to the stream. After several iterations of the solutions were made, and several algorithms were implemented, Dr. Hernandez determined that adding visual components could also be done asynchronously but would require heavy production efforts, great amounts of bandwidth, and the off-line generation of video assets. Dr. Hernandez's vision was to use real-time video generation using HTML assets to assemble and present User Interfaces while encoding and broadcasting the audio stream in a format compatible with IPTV, Cable TV, or Satellite system. This solution was more efficient and even today is still in use.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43, as they do not pertain to Stingray Music, and denies them on that basis.

44.     In or around 2013, Dr. Hernandez notified Mood Media, under confidentiality, that he was working on a real-time solution that was going to generate on-the-fly video assets with metadata and other widgets, and broadcast to set top boxes or other IPTV systems. After multiple iterations, Dr. Hernandez found that using a headless rendering engine and incorporating web assets was going to be the way to solve a real-time solution that could be scaled.

17

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44, as they do not pertain to Stingray Music, and denies them on that basis.

45.    Dr. Hernandez incorporated a solution relying on web user interfaces and javascript for on screen animations and updates and concluded this to be the most efficient way for real-time broadcasting visual assets to set-top-boxes was going to work. Dr. Hernandez showed the results of this solution in operation at a cable operator, Cablevision Mexico, in March 2014, but did not share any technical details as it remained Dr. Hernandez's trade secret at that time.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45, as they do not pertain to Stingray Music, and denies them on that basis.

46.    This innovative solution greatly improved head-end software and streaming management as well as music license tracking. As part of the services rendered for Mood Media, for example, Dr. Hernandez hosted in his platform all the required web-assets, music, and user interfaces that were necessary for Mood Media's services like DMX2GO or mobile applications that were being commercialized by Mood Media/DMX. As such, Dr. Hernandez's novel solution enabled a unified distribution system and shared resources across web, mobile, and cable TV.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46, as they do not pertain to Stingray Music, and denies them on that basis.

47.    From about 2013-mid-2014, Dr. Hernandez continued to work on developing proprietary technology, including creating visual components were rendered and generated on-the-fly with metadata, configurable backgrounds, and music content. In or around mid-2014, Dr.

Hernandez perfected these innovations while developing his latest version of the platform's source code. Collectively, these innovations for delivering multi-media are "Dr. Hernandez's Trade Secrets."

**RESPONSE**: Paragraph 47 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47, as they do not pertain to Stingray Music, and denies them on that basis.

48.     Dr. Hernandez's Trade Secrets, thus include, but are not limited to, source code, HTML and XML code, functional requirement specifications, operating procedures, automation validation test scripts, equipment listings, configuration specifications, all architecture methods and systems with encodings scripts, source code to generate screens, source code implementation on how "still images" were generated by the caching unit and broadcasted using an MPEG Transport Stream, use of multicast IP Addresses, GOP sizes, audio encoders levels, and information in the Asserted Patents before their public disclosure on June 30, 2016 (*see e.g*., **Exhibits 24-26**).[4]

**RESPONSE**: Paragraph 48 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48, as they do not pertain to Stingray Music, and denies them on that basis.

49.     Dr. Hernandez spent thousands of hours researching, testing, analyzing and compiling data, which ultimately lead to developing Dr. Hernandez's Trade Secrets. This compiled information included the computing resource utilization, network and processor performance, user experience and overall costs associated with various different software and system architectures,

and the interplay between aspects of those various different architectures and how each contributes to such performance and costs. Based on the analysis of the research and testing data, Dr. Hernandez determined that a unique and proprietary software and system architecture to provide streaming audio and video content.

**RESPONSE**: Paragraph 49 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49, as they do not pertain to Stingray Music, and denies them on that basis.

50.     Dr. Hernandez's Trade Secrets derive independent economic value from not being generally known to the public or to others who can obtain economic value from its disclosure or use. Dr. Hernandez together with various members of his team performed extensive research and development, testing and trials in relation to developing Dr. Hernandez's Trade Secrets. This included work performed and know how gained over several years involving a significant investment of time and money.

**RESPONSE**: Paragraph 50 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50, as they do not pertain to Stingray Music, and denies them on that basis.

51.     This significant economic value of Dr. Hernandez's Trade Secrets derives from the following:

- Dr. Hernandez spent thousands of hours of research, development and testing around the world in order to develop Dr. Hernandez's Trade Secrets.

- Dr. Hernandez's Trade Secrets include source code.

- It took Dr. Hernandez and others working for him many years to develop and write source code.

- The development of the Dr. Hernandez's Trade Secrets source code required a significant investment of time and money.

**RESPONSE**: Paragraph 51 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51, as they do not pertain to Stingray Music, and denies them on that basis.

52.    Except for certain of Dr. Hernandez's Trade Secrets that disclosed in his published patent application June 30, 2016, his trade secrets remained secret. For example, the hardware and software were never provided to third parties without confidentiality agreements, and access to the hardware and software was strictly controlled and limited to the engineers working on it. The software is provided via a cloud server provider, which hosts software applications and simply makes the application accessible to authorized end users over the Internet. These host servers were controlled by Plaintiffs and, accordingly, the software and the source code was not known or accessible to others.

**RESPONSE**: Paragraph 52 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52, as they do not pertain to Stingray Music, and denies them on that basis.

53.    Throughout the development of Dr. Hernandez's technology for streaming audio and video content, all the source code and software was kept confidential pursuant to NDAs and confidentiality agreements, and all access to the servers and source code was exclusively managed

by Dr. Hernandez. Dr. Hernandez personally visited several sites or hired an engineer contractor to visit the Cable Operator sites (head-ends) where his servers were going to be located to confirm servers would have adequate internet access, power, and physical security. All software and firmware updates were made using secured IP tunnels that connected using iWeb or Equinix.

**RESPONSE**: Paragraph 53 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53, as they do not pertain to Stingray Music, and denies them on that basis.

54.    As a result of Dr. Hernandez's security measures, access to Dr. Hernandez's confidential and proprietary technology, including his source code, was only possible if the servers and corresponding hard drives were unlawfully accessed.

**RESPONSE**: Paragraph 54 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54, as they do not pertain to Stingray Music, and denies them on that basis.

## C.    Mood Media Induces Dr. Edwin Hernandez to Disclose its Trade Secrets to Stingray with a Fraudulent Agreement

55.    During the Fall of 2013, EGLA CORP and Mood Media/DMX negotiated a term sheet agreement to license the platforms in iWeb, Equinix, mobile applications, and other web applications, and an option to include future platform development. The term sheet was signed on December 18, 2013 with an Effective Date of January 1, 2013 (**Exhibit 9**) by Dr. Alcides Hernandez as CEO of EGLA CORP.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55, as they do not pertain to Stingray Music, and

denies them on that basis, except to state that the referenced term sheet (Exhibit 9) speaks for itself and is the best evidence of its contents.

56.     During these negotiations, Dr. Alcides Hernandez was not informed that a merger transaction was taking place behind the scenes with Stingray, and that Stingray intended to gain unauthorized access to Dr. Hernandez's Trade Secrets, including his servers, and source code, via its acquisition of Mood Media/DMX.

**RESPONSE**: Paragraph 56 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 56 that pertain to Stingray Music. Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 56, as they do not pertain to Stingray Music, and denies them on that basis.

57.     When Dr. Hernandez discovered around March 2014 that Mood Media/DMX division was being acquired by Stingray for $16M, he immediately communicated with Alejandro Cacciola (**Exhibit 11** at 5-6). As noted, Messrs. Cacciola and Tonelli were DMX Media General Managers and executives who later became executives of Stingray. However, during the negotiation with EGLA CORP before February/March 2014, despite being employed by Stingray, even appearing in industry magazines (**Exhibit 10** at 16), both executives posed as Mood Media/DMX contacts to EGLA CORP when negotiating for access and use of Dr. Hernandez's technologies.

**RESPONSE**: Stingray Music admits that Alejandro Cacciola and Gustavo Tonelli became employees of Stingray Music in January 2014. Stingray Music denies the remaining allegations in Paragraph 57 that pertain to Stingray Music, including any allegations or implications of any wrongdoing by Stingray Music, except to state that Exhibit 11 speaks for itself and is the best

evidence of its contents. Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 57, as they do not pertain to Stingray Music, and denies them on that basis.

58.     By April 24, 2014, after Mood Media had consummated the $16.3M Stingray transaction, Dr. Hernandez received a letter from the Vice President of Legal for Mood Media, Melanie McCool, purporting to terminate the "term-sheet" that covered Mood Media/DMX's access to and use of Dr. Hernandez's technologies (**Exhibit 11** at 1). Ms. McCool further claimed that the "[t]echnology didn't work" and that it was not in use by Mood Media, hence such agreement was unenforceable.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58, as they do not pertain to Stingray Music, and denies them on that basis, except to state that Exhibit 11 and the referenced "term sheet" speak for themselves and are the best evidence of their contents.

59.     The term sheet agreement had a duration of three years and made clear that all Intellectual Property and technology ownership was owned by Dr. Hernandez and his companies. In fact, all servers that were installed in all cable operators contained a "End User Licensing Agreement" that prohibited any reverse engineering (**Exhibit 12** at 3).

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59, as they do not pertain to Stingray Music, and denies them on that basis, except to state that the referenced term sheet agreement speaks for itself and is the best evidence of its contents.

60.     As noted, in an around March 2014, Dr, Hernandez found out via an internet search that Mood Media/DMX had been sold to Stingray. However, Mood Media never notified Dr.

Hernandez, much less sought authorization for Stingray to access and use his servers containing his proprietary technology. At no time did Dr. Hernandez and EGLA CORP agree to give Stingray access any of Dr. Hernandez's servers.

**RESPONSE**: Stingray Music denies that Mood Media/DMX was sold to Stingray Music and denies the remaining allegations in Paragraph 60 that pertain to Stingray Music, including any allegations or implications of any wrongdoing. Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 60, as they do not pertain to Stingray Music, and denies them on that basis.

61.     Around April 10-14, 2014, Dr. Hernandez was concerned that his server assets had been compromised and that he needed to delete and disconnect his services to avoid unauthorized access and use of his technology by Stingray, who now appeared to be controlling head-ends and customers previously licensed by Mood Media. Dr. Hernandez sent emails to Mr. Tonelli, Ms. McCool (then working for Mood Media, now working for Stingray), and others in an attempt to confirm that there was no unauthorized access and use of his technology (**Exhibit 11** at 5-6).

**RESPONSE**: Stingray Music denies the allegations in Paragraph 61 that pertain to Stingray Music, including any allegations or implications of any wrongdoing. Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 61, as they do not pertain to Stingray Music, and denies them on that basis, except to state that Exhibit 11 speaks for itself and is the best evidence of its contents.

62.     By April 2014, Mr. Tonelli was already using a @stingraydigital.com email address (**Exhibit 13** at 2), however around 2014, Mr. Tonelli wrote from his mac.com account (**Exhibit 14.1**) and "privately" stated that, by discontinuing his services to Mood Media/DMX, "MOOD

will sue you for breaching the agreement without proper notice, and it will seek (and most likely get, because you don't have a case) damages for all the money STINGRAY will sue them for."

**RESPONSE**: Stingray Music admits that by April 2014, Gustavo Tonelli had access to an @stingraydigital.com email. Stingray Music denies the remaining allegations in Paragraph 62, including any allegations or implications of any wrongdoing by Stingray Music, except to state that Exhibits 13 and 14.1 speak for themselves and are the best evidence of their contents.

63.     At about that time, as shown in Florida's Department of State Corporation records website, Sunbiz.org, Mr. Tonelli became a director of a company affiliated with Stingray, Stingray Music USA, Inc (**Exhibit 14**). In addition to Messrs. Tonelli and Cacciola, it is unknown what other Stingray personnel at that time would have had access to Dr. Hernandez's servers by virtue of their former employment by Mood Media.

**RESPONSE**: Stingray Music admits that Gustavo Tonelli and Alejandro Cacciola became employees of Stingray Music in January 2014. Stingray Music denies the remaining allegations in Paragraph 63, including any allegations or implications of any wrongdoing by Stingray Music.

64.     As Dr. Hernandez later discovered in April of 2021, and shown in the **Exhibits 15 and 16**, Stingray had access to the same cable operators where Dr. Hernandez had his servers in operation. See, for example, CableMAS (**Exhibit 15** at 20), AXTEL TV (*Id.* at EGLA-TRELLO-000143), CABLE VISION (*Id.* at EGLA-TRELLO-000435, ENCOMPASS (**Exhibit 16** [11] at EGLA-TRELLO-000520).

**RESPONSE**: Stingray Music denies the allegations in Paragraph 64.

65.     On April 14, 2014, Dr. Hernandez contacted the Intellectual Property division, Department of Homeland Security (DHS) of the FBI (**Exhibit 17**) to report his concern that Stingray may have access to his servers.

**RESPONSE**: Stingray Music admits that on April 14, 2014, Dr. Hernandez contacted the Department of Homeland Security (DHS) via email addressed to IPRCenter@dhs.gov. Stingray Music denies the remaining allegations in Paragraph 65, except to state that Exhibit 17 speaks for itself and is the best evidence of its contents.

66.     When Dr. Hernandez raised his concerns about Stingray's possible access to his servers and thus his technology, Mr. Tonelli warranted that "STINGRAY DIGITAL has no knowledge of, nor involvement on, the specifics of MOOD MEDIA's content delivery technology - EGLA's or otherwise - nor has the intention of acquiring or learning such technology" (**Exhibit 14.1** at 2).

**RESPONSE**: Stingray Music denies the allegations in Paragraph 66, including any allegations or implications of any wrongdoing.

67.     Despite his concerns, in light of Mood Media's assertion that Stingray did not have access to Dr. Hernandez's technology, he had no choice but to assume Mood Media was acting in good faith and honor the term sheet agreement that was signed or risk being liable for a $16M transaction between Stingray and Mood Media.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 67.

68.     On April 15, 2014, as memorialized in his email (copied below) to individuals at Mood Media, Dr. Hernandez's remote access via Dr. Hernandez's pre-established IP Tunnels, was severed by Stingray or Mood Media, and, on information and belief, all of his servers at all cable operators were unlawfully stolen by Stingray.



**RESPONSE**: Stingray Music denies the allegations in Paragraph 68.

69.    Throughout the development of Dr. Hernandez's Trade Secrets and proprietary technology and at all times afterward, Dr. Hernandez and his company EGLA CORP made every effort and followed procedures to ensure that all of the trade secrets of his system remained secret. For example, Dr. Hernandez followed all best practices to secure configuration files, manuals, and all source code behind firewalls and IP secured Tunnels. Additionally, physical access was strictly controlled at the EQUINIX data center in Boca Raton, FL as well as iWeb.com. All employees to EGLA, associates and partners were required to sign NDAs in order to preserve the secrecy of all of Dr. Hernandez's Trade Secrets and innovations.

**RESPONSE**: Paragraph 69 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 69.

70.     It is evident now that Mood Media and Stingray worked together to gain access to Dr. Hernandez's Trade Secrets, including his source code. As explained below, it wasn't until around mid-April 2021 that Dr. Hernandez realized that the term sheet agreement signed with Mood Media was breached and Plaintiffs were defrauded by Mood Media's $16,000,000 transaction with Stingray wherein Mood Media provided Stingray with unauthorized access to Dr. Hernandez's Trade Secrets and server technology.

**RESPONSE**: Paragraph 70 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 70 .

71.     The term sheet agreement between Plaintiffs and Mood Media prohibited the transfer and use of Dr. Hernandez's technology by any party other than Mood Media/DMX. Accordingly, Plaintiffs are informed and believe that Mood Media had no intention to honor the agreement and instead intended to provide Stingray access to Dr. Hernandez's Trade Secrets and intellectual property upon completion of Stingray's acquisition of Mood Media/DMX.

**RESPONSE**: Paragraph 71 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 71.

72.     Once Mood Media completed its transaction with Stingray, and provided Stingray access to Dr. Hernandez's technology, it terminated the agreement with Plaintiff in or around April 24, 2014.

**RESPONSE**: Paragraph 72 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 72.

73.    Mood Media later asked Plaintiffs to sign a "settlement" agreement under the false and fraudulent premise that Dr. Hernandez's intellectual property had not been tampered with, stolen, or provided to Stingray.

**RESPONSE:** Paragraph 73 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 73.

74.    Therefore, Mood Media and Stingray were enriched from their unlawful actions and put at risk Dr. Hernandez's Trade Secrets and intellectual property assets.

**RESPONSE**: Paragraph 74 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 74.

**D.     Dr. Hernandez Discovers Theft of his Intellectual Property in April 2021**

75.    On information and belief, Stingray uses a server device called UBIQUICAST. However, no documentation on how this device operates and works is publicly available.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 75.

76.    Despite Stingray's secrecy provisions and the lack of public disclosure regarding the operation of Stingray's streaming services, in and around April 11, 2021, Dr. Hernandez discovered a website called **trello.com** and learned from it that the technologies used by Stingray incorporated his trade secrets and infringed on his patents (**Exhibits 15-16**).

**RESPONSE**: Paragraph 76 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 76.

77.     As a result, Dr. Hernandez then realized that Stingray had gained unauthorized access to Dr. Hernandez's source code in or around April of 2014 by physically having control of his servers that contained his source code and other of his trade secrets. As noted above, on information and belief, at that time Stingray also terminated access to Dr. Hernandez's servers.

**RESPONSE**: Paragraph 77 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 77.

78.     Until recently, Stingray has concealed how its UBIQUICAST software works. During the period corresponding to 2017 to 2020, Dr. Hernandez carefully examined several heavily redacted documents from the patent infringement litigation pending in the Eastern District of Texas between Music Choice and Stingray, Case No. 2:16-CV-0586-JRG-RSP (**Exhibit 18**), and tried to extract as much information as possible.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 78 that pertain to Stingray Music, including any allegations or implications of any wrongdoing. Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 78, as they do not pertain to Stingray Music, and denies them on that basis.

79.     In this patent litigation between Stingray and Music Choice, and its associated breach of contract case, the closest disclosure was found in Judge Payne's order disclosing that Stingray had two versions of their technology (**Exhibit 18** at 344):

- OSE1 pre-Fall 2014 – not accused of infringement and trade secret misappropriation by Plaintiffs

- OSE2 after-Fall 2014 - accused of infringement and trade secret misappropriation by Plaintiffs

**RESPONSE**: Stingray Music denies the allegations in Paragraph 79.

80.    On information and belief, Ubiquicast OSE2 server was created by Stingray no later than March 2015 (".. prior to March 2015, Stingray did not offer or provide any music video TV channels to MVPDs…") as indicated by Stingray attorneys in the following partially redacted filing on June 4, 2019 (**Exhibit 18** at 9).



Case 2:16-cv-00586-JRG-RSP   Document 203   Filed 06/04/19   Page 9 of 21 PageID #:  10489
REDACTED
**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

(STINGRAY118548 (Ex. 9)). Although Stingray provides at ████████████████████ ████████, ██████████████████████████████████████t (the "Stingray Music TV App"). (*Id.*; Report (Ex. 1), ¶49). Stingray first provided █████ with the accused Stingray Music TV App in March 2015. (██████████████████████ ████████████(Ex. 11), pp. 1, 9); ████████████████ ████████████(Ex. 12)). Prior to March 2015, Stingray did not offer or provide any music video TV channels to MVPDs that are accused of infringing the patents-in-suit. (*See id.*; Report (Ex. 1), ¶¶62, 88).

**RESPONSE**: Stingray Music denies the allegations in Paragraph 80.

81.    Additionally, in the complaint and amended complaints filed by Music Choice, Music Choice attorneys stated that Stingray had two versions of the UbiquiCAST platform. In particular, Music Choice alleged that "Stingray, in the fall of 2014, launched, as part of AT&T's U-Verse® services, an improved digital audio music and video on demand… included the features

and functionality infringing Music Choice's patents – features and functionality that Music Choice had not previously observed in Stingray's product offering prior to Stingray's access to the information it obtained from Music Choice." (**Exhibit 18** at 717, ¶ 41)

**RESPONSE**: Stingray Music denies the allegations in Paragraph 81, except to state that the referenced complaint and amended complaint speak for themselves and are the best evidence of their contents.

82.     Therefore, on information and belief, by Q4 of 2014, Stingray had a new version of the server, called Ubiquicast OSE2 server, that incorporated Dr. Hernandez's Trade Secrets, which Stingray obtained unlawfully by its unauthorized access to Dr. Hernandez's servers and source code.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 82.

83.     Through subsequent investigation, Dr. Hernandez learned that Stingray continued to develop new products into which Stingray has incorporated Dr. Hernandez's Trade Secrets thus misappropriating Dr. Hernandez's and other EGLA CORP's proprietary information and know-how for its own benefit at Plaintiffs' expense. For example, Stingray has gained customers such as AT&T U-verse®, Millicom's TIGO®, Blue Stream, and over 700+ cable operators resulting in 400 million subscribers in 156 countries (*See* **Exhibit 4**, listing some of the cable operators).

**RESPONSE**: Stingray Music denies the allegations in Paragraph 83.

**E.     Dr. Hernandez's Offer to License his Patented Technology to Stingray**

84.     On information and belief, Stingray gained access to employees, documents, servers, and source code that was compromised during the Mood Media/DMX acquisition in 2014. Stingray was able to see all components and Dr. Hernandez's technologies in operation at a cable operator and severed all access to Dr. Hernandez in and around April 15, 2014.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 84.

85.    To this date, Stingray's UbiquiCAST servers' information are not publicly available and rather vaguely described by Stingray on their web page[5]:

> Ubiquicast servers are set-up and configured to each client's specific requirements before being shipped to head-ends. This process facilitates installation and expedites time to market for new services. Stingray's technical team is available 24/7 for help and support, ensuring reliable and uninterrupted service for your customers.

**RESPONSE**: Stingray Music admits that certain confidential information is not publicly available and denies the remaining allegations in Paragraph 85..

86.    As a result, Dr. Hernandez was unaware of any misappropriations and, beginning in 2017, proceeded to offer his help and expertise to Stingray as part of the patent dispute with Music Choice. Around September 15, 2017, Dr. Hernandez's company, EGLA CORP, and Stingray signed an NDA in connection with business discussions (**Exhibit 19**). Dr. Hernandez informed Stingray about his patent applications and proposed that Stingray would use his patented technologies as an alternative non-infringing solution to Music Choice's dispute.

**RESPONSE**: Paragraph 86 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86, as they do not pertain to Stingray Music, and denies them on that basis.

87.    Around 2018, Dr. Hernandez approached Stingray, as his first patent issued on November 6, 2018, and offered to license his patent portfolio and include all source code. As noted above, Dr. Hernandez and EGLA CORP were unaware that Stingray had misappropriated Dr. Hernandez's Trade Secrets at that time.

**RESPONSE**: Paragraph 87 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87, as they do not pertain to Stingray Music, and denies them on that basis.

88.    Again, on July 12, 2019, once USPTO granted the '074 patent to Dr. Hernandez, he presented a similar offer as he made in 2017 to Stingray's Board of Directors (**Exhibit 20**).

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88, as they do not pertain to Stingray Music, and denies them on that basis.

89.    After several attempts and discussions held from 2017 to 2019 with Stingray's technical staff and its Vice President of Legal, Lloyd Feldman, that included providing Stingray with a copy of Dr. Hernandez's U.S. Patent Nos. 10,123,074 and 10,524,002, documentation, and presentations (**Exhibits 21, 22, and 23**), none of these communications received any positive or negative feedback from Stingray's counsel. Stingray's management and executives ultimately showed no interest in obtaining any licensing or developing any collaboration with EGLA CORP. Therefore, Dr. Hernandez ceased all communications with Stingray.

**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89, as they do not pertain to Stingray Music, and denies them on that basis.

90.    In hindsight, it is evident now that Stingray had no need to purchase or license Dr. Hernandez's technology as Stingray had illegally stolen Dr. Hernandez's Trade Secrets and was already using his technologies, including those that had been patented.

**RESPONSE**: Paragraph 90 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 90.

**F.    Stingray Misappropriation of Dr. Hernandez's Trade Secrets**

91.    As noted above, on or about April 7, 2021, Dr. Hernandez, as part of his diligence process and continuing its investigation into the possible unauthorized access to his proprietary technology by Stingray, discovered the trello.com website. From about April 7, 2021 to April 20, 2021, Dr. Hernandez reviewed all trouble tickets published on Trello and compiled them as shown in **Exhibits 15 and 16**.

**RESPONSE**: Paragraph 91 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 91, including any allegations or implications of any wrongdoing.

92.    The site's url, https://trello.com/b/89nC7n95/telesur-check-list, contained hundreds of trouble tickets generated by Stingray regarding its OSE2 Ubiquicast Server. The evidence also points to internal servers at stingray.com and stingraydigital.com, primarily JIRA instances "Jira Issue Link : https://jira-stage.corp.stingraydigital.com/browse/CUSTTS-1284," as well as other Stingray internal sites such as "confluence."[6] A screen shot of the website is shown herein:



**RESPONSE**: Stingray Music denies the allegations in Paragraph 92, including any allegations or implications of any wrongdoing.

93.     The trello.com website contains hundreds of entries from what appears to be all trouble tickets that Stingray handled with customers as early as March 2015 and as late as 2018. An example is shown in the following screenshot from **Exhibits 15 and 16**:



**RESPONSE**: Stingray Music denies the allegations in Paragraph 93, including any allegations or implications of any wrongdoing.

94.     Dr. Hernandez proceeded to download relevant content and evaluate this evidence, none of which was disclosed in Stingray's patent litigation with Music Choice. Dr. Hernandez concluded that the content of the tickets was genuine and that there was sufficient evidence in these files to demonstrate that Stingray misappropriated Dr. Hernandez's Trade Secrets and, when it was later patented, infringes his patents.

**RESPONSE**: Paragraph 94 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 94, including any allegations or implications of any wrongdoing.

95.     For example, several of Dr. Hernandez's servers were installed at the same cable operators found at, for example, AXTEL TV, CABLE VISION and ENCOMPASS. The trello.com evidence demonstrates that Stingray had access to the servers that Dr. Hernandez installed and remotely managed. As shown in the following trouble tickets citing to AXTEL TV around April 13, 2015 (**Exhibit 15**, EGLA-TRELLO-000532), and many others.



**RESPONSE**: Paragraph 95 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 95, including any allegations or implications of any wrongdoing.

96.     By examining trello.com evidence, Dr. Hernandez concluded that those skilled in the art would be able to demonstrate that Stingray's references at trello.com are representative of the software used in its UbiquiCAST servers and that those servers performed the same functions that are patented in Dr. Hernandez's Asserted Patents.

**RESPONSE**: Paragraph 96 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 96, including any allegations or implications of any wrongdoing.

97.     For instance, the Texas litigation at the "Daubert order" describes vaguely an artifact called "StillPict Generator" (**Exhibit 18** at MC-EGLA-000336):

any prejudice to Plaintiff, the Court will **GRANT** Music Choice's Motion for Leave to supplement its expert report with respect to Dr. Shamos' specific non-infringement theory that no transmission occurs because "the Audio Engine and StillPic Generator components of the accused Ubiquicast machine purportedly send data between them via a shared RAM memory," and the allegedly new invalidity theory regarding MP4 technology. The supplemental report of Dr. Russ will be strictly limited to that scope and must be served by no later than noon on Monday, November 11, 2019. Any issues regarding the scope of this report may be raised at the November 12 pretrial conference.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 97, including any allegations or implications of any wrongdoing.

98.     The same component "StilPic Generator," cited by the court order, is referenced in trello.com. As shown in trouble ticket below (**Exhibit 15**, at EGLA-TRELLO-000530), the text "monit alerts for various components " that includes: "stillpicgenerator, ubimetaserver and ubiquicast."



**RESPONSE**: Stingray Music denies the allegations in Paragraph 98, including any allegations or implications of any wrongdoing.

99.    Dr. Hernandez reviewed over 654 references from trello.com to derive all claim charts (**Exhibits 24-26**) and conclude Stingray misappropriated his trade secrets and infringed his patents.

**RESPONSE**: Paragraph 99 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 99, including any allegations or implications of any wrongdoing.

100.     Dr. Hernandez's and EGLA CORP's stolen servers included confidential, proprietary, and trade secret software, designs, configuration contained in its servers that Gustavo Tonelli and Alejandro Cacciolla and other ex-DMX employees were aware of when employed by Mood Media and later when they became Stingray employees.

**RESPONSE**: Paragraph 100 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 100, including any allegations or implications of any wrongdoing by Stingray Music.

101.     These servers contained source code in python, C/C++ encoders, a Linux-based software, PNG backgrounds, FFMPEG, MONIT, video generators, URL-based resources, and web asset processing, Audio in AC-3, Video in H.264 codecs etc. Dr. Hernandez's Trade Secrets included all architecture methods and systems with encodings scripts, source code to generate screens, use of multicast IP Addresses, GOP sizes, audio encoders levels, and other configurations that the evidence shows were misappropriated by Stingray employees or contractors under Stingray's direction and control.

**RESPONSE**: Paragraph 101 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 101 that pertain to Stingray Music, including any allegations or implications of any wrongdoing by Stingray Music or its employees or contractors. Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 101, which are denied on that basis.

102.     While Stingray's UbiquiCAST OSE2 servers appear from the trello evidence to be based on CentOS, a Linux-based system, and Dr. Hernandez used Ubuntu's platform, both systems use FFMPEG (**Exhibit 15 and 16** at EGLA-TRELLO-00063), Video Generators (*Id.* at EGLA-

TRELLO-000565), URL and web asset processing (*Id.* at EGLA-TRELLO-0000565), MONIT (*Id.* at EGLA-TRELLO-000528), GOP Sizes (*Id.* at EGLA-TRELLO-000568), Multicast IP Address (*Id.* at EGLA-TRELLO-000639), EGLA-TRELLO-000604, Audio in AC-3 (*Id.* at EGLA-TRELLO-000450), Video in H.264 (*Id.* at EGLA-TRELLO-000654), for example.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 102, including any allegations or implications of any wrongdoing.

103. Additionally, UbiquitCAST OSE2 servers use PNG backgrounds, which is not disclosed in Dr. Hernandez's U.S. Patent specifications, but is in the source code that was stored in the file. Indeed, the trouble tickets (**Exhibit 15** at EGLA-TRELLO-000496) and the directory "/data/stillpic/background," apparently are only supported by UbiquiCAST OSE2 servers. As shown herein:



**RESPONSE**: Stingray Music denies the allegations in Paragraph 103, including any allegations or implications of any wrongdoing.

104.     Similarly, UbiquiCAST OSE2 is connected to the cloud, to Amazon's web services in the same manner that Dr. Hernandez's system operated with DMX2GO and iWeb platforms (**Exhibit 16** at 5, 10, 50, 54, and others).

**RESPONSE**: Stingray Music denies the allegations in Paragraph 104, including any allegations or implications of any wrongdoing.

105.    Stingray's OSE2 software contain additional of Dr. Hernandez's Trade Secrets relating to the fact that, for example, like Dr. Hernandez's servers, they both can broadcast in different formats, including:

A. Broadcast audio with MPEG Data

B. Broadcast Audio with MPEG2Video and MPEG Data

C. Broadcast Audio with H.264 Video and MPEG Data

D. Where MPEG Data is optional.

The printout from trello.com reveals this fact (**Exhibit 15** at EGLA-TRELLO-000654).



**RESPONSE**: Paragraph 105 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 105.

106.    Dr. Hernandez's Trade Secrets included, among other things, all the source code implementation on how "still images" were generated by the caching unit and broadcasted using

an MPEG Transport Stream, which are fundamental parts of UbiquiCAST 0SE2 (**Exhibits 15 and 16**).

**RESPONSE**: Paragraph 106 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 106.

107.    Therefore, Dr. Hernandez was able to demonstrate multiple instances where his trade secrets appeared in UbiquiCAST OSE2 servers before the June 2016 date when certain of the trade secrets were published as part of Dr. Hernandez's patent applications.

**RESPONSE**: Paragraph 107 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 107.

**G.    Dr. Hernandez's Asserted Patents**

108.    In December of 2014, Dr. Hernandez filed for patent protection for his technological innovations and has received approval of 94 claims spread across three (soon to be four) U.S. Patents and 8 claims in an European Patent covering 17 jurisdictions, patents infringed by Defendants.

**RESPONSE**:  Paragraph 108 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies any allegations or implications of wrongdoing, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 108, which are denied on that basis.

109.    On November 8, 2018, the United States Patent and Trademark Office (the "PTO") duly and lawfully issued United States Patent No. 10,123,074 ("'074 Patent"), entitled "Method, system, and apparatus for multimedia content delivery to cable TV and satellite operators." A true

**Exhibit 1** . Dr. Hernandez is the sole owner of the '074 Patent.

**RESPONSE**: Paragraph 109 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music states that U.S. Patent No. 10,123,074, issued on November 8, 2018, speaks for itself and is the best evidence of its contents, and denies the remaining allegations in Paragraph 109.

110.   On December 31st, 2019, the United States Patent and Trademark Office (the "PTO") duly and lawfully issued United States Patent No. 10,524,002 ("'002 Patent"), entitled "Method, system, and apparatus for multimedia content delivery to cable TV and satellite operators." A true and correct copy of the '002 Patent is attached as **Exhibit 2**. Dr. Hernandez is the sole owner of the '002 Patent.

**RESPONSE**: Paragraph 110 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music states that U.S. Patent No. 10,524,002, issued on December 31, 2019, speaks for itself and is the best evidence of its contents, and denies the remaining allegations in Paragraph 110.

111.   On October 5, 2021, the United States Patent and Trademark Office (the "PTO") duly and lawfully issued United States Patent No. 11,140,441("'441 Patent"), entitled "Method, system, and apparatus for multimedia content delivery to cable TV and satellite operators." A true and correct copy of the '441 Patent is attached as **Exhibit 3**. Dr. Hernandez is the sole owner of the '441 Patent.

**RESPONSE**: Paragraph 111 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music states that U.S. Patent No. 11,140,441, issued on October 5, 2021, speaks for itself and is the best evidence of its contents, and denies the remaining allegations in Paragraph 111.

112.    On March 18, 2024, the United States Patent and Trademark Office (the "PTO") issued a Notice of Allowance for US Patent Application. US17/493490 ("the '490 patent application") entitled "Method, system, and apparatus for multimedia content delivery to cable TV and satellite operators." A true and correct copy of the '490 Patent claims is attached as Exhibit 27. Dr. Hernandez is the sole owner of the '490 Patent Application.[7]

**RESPONSE**: Paragraph 112 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112, which are denied on that basis.

**H.    Defendants Stingray, AT&T and Millicom's Use of the Patented Technology**

113.    Stingray and its customers have been and are directly infringing and indirectly infringing the Asserted Patents.

**RESPONSE**: Paragraph 113 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 113.

114.    On information and believe, Stingray is a worldwide distributor of on-demand and liner content via the Internet, Cable Operators, IPTV Systems, and other devices, including cars.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 114.

115.    Stingray makes, uses, sells, and offers for sale in the United States products and services that infringe the Asserted Patents, and continues to do so. These infringing products and services include online streaming services operated by Stingray through its Application, Site, Ubiquicast and other cloud-based Server(s) using at least UbiquiCAST OSE2 (collectively, "the Accused Streaming Services").

**RESPONSE**: Paragraph 115 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 115.

116.   AT&T offers its product "AT&T U-verse®" and has assigned channels 5100 to 5174 that, from 2014 to 2024, have been serviced using UbiquiCAST OSE2 (**Exhibit 28**) (copied below).



**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 116, as they do not pertain to Stingray Music, and denies them on that basis.

117.   Millicom operates under the corporate trade name "TIGO." TIGO offers mobile and TV streaming Products that in countries like Honduras, Paraguay, El Salvador, Bolivia, Guatemala, Nicaragua, and Colombia. The exhibit shows the mobile application and by using UbiquiCAST OSE2 (**Exhibit 15** at 82 and **Exhibit 16** at 94) with the signal received by a Set Top Box, KAON VMM 1003 Set Top Box.





**RESPONSE**: Stingray Music lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117, as they do not pertain to Stingray Music, and denies them on that basis.

I.      **Stingray Made Over $2B in Revenues From 2014 – 2023 and Derived From Dr.
        Hernandez's Trade Secrets and Patented Technology**

118.    In the case between Music Choice and Stingray, under oath, Music Choice's
attorney argued that OSE1 was an inferior product: *"OSE1 lacked the commercially-desirable
features that were present in both OSE2 and Audio Service, while also explaining why he
considered the missing features to be a significant disadvantage of OSE1."* (**Exhibit 18** at MC-
EGLA-000348).

        **RESPONSE**: Paragraph 118 includes legal arguments and legal conclusions that do not
require a response. To the extent a response is required, Stingray Music states that the litigation
argument made by Music Choice is a matter of public record and otherwise denies the allegations
in Paragraph 118.

119.    During the timeframe corresponding to 2014 to 2024 and after the DMX acquisition
and the trade secret theft, Stingray completed an IPO raising C$140M (over US$112 M)[8], and
raised its annual revenues from around C$80.6M in 2013 to C$323M in 2023.[9]

        **RESPONSE**: Paragraph 119 includes legal arguments and legal conclusions that do not
require a response. To the extent a response is required, Stingray Music denies the allegations in
Paragraph 119, including any allegations or implications of wrongdoing.

120.    In the litigation between Stingray and Music Choice, Music Choice's damages
expert opined that Stingray gained US$14.6M in revenues from AT&T and $0.83M from Liberty
(**Exhibit 18** at MC-EGLA-000346).

        **RESPONSE**: Paragraph 120 includes legal arguments and legal conclusions that do not
require a response. To the extent a response is required, Stingray Music states that the opinions
offered by Music Choice's damages expert at trial are a matter of public record and otherwise
denies the allegations in Paragraph 120.

121.    In sum, the release of Ubiquicast OSE2 coincides with Stringray's IPO and Stingray's increased revenues and subscriber base. Dr. Hernandez' technologies were fundamental to "upgrade" OSE1 to OSE2 and hence catapult Stingray revenues, make acquisitions, and gain a leadership position in the industry.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 121.

122.    Therefore, Stingray illegally enriched itself by hundreds of millions of dollars creating OSE2, a superior product to OSE1, using Dr. Hernandez's Trade Secrets and patented technology.

**RESPONSE**: Paragraph 122 includes legal arguments and legal conclusions that do not require a response. To the extent a response is required, Stingray Music denies the allegations in Paragraph 122.

### FIRST CAUSE OF ACTION
### Violation of Defend Trade Secrets Act 18 U.S.C. § 1836 *et seq.*
### (Against Stingray and Mood Media)

123.    Plaintiffs incorporate paragraphs 1-122 as though fully set forth herein.

**RESPONSE**: Stingray Music incorporates its responses to Paragraphs 1-122 as if fully set forth herein.

124.    The Dr. Hernandez's Trade Secrets, including but not limited to, source code, HTML and XML code, functional requirement specifications, operating procedures, automation validation test scripts, equipment listings, configuration specifications, all architecture methods and systems with encodings scripts, source code to generate screens, source code implementation on how "still images" were generated by the caching unit and broadcasted using an MPEG Transport Stream, use of multicast IP Addresses, GOP sizes, audio encoders levels, and information in the Asserted Patents before their public disclosure on June 30, 2016 (*see e.g.*,

**Exhibits 24-26**) that Stingray and Mood Media had access to via Mood Media's agreement with Plaintiffs, are trade secrets which Plaintiffs have taken reasonable measures to keep secret and from which Plaintiffs derive independent value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.

> **RESPONSE**: Stingray Music denies the allegations in Paragraph 124.

125.    As detailed above, Dr. Hernandez's Trade Secrets are used to deliver audio and video content using cloud-based platforms and mobile applications using secure remote servers which are then distributed in the United States and abroad, and as a result, are related to a product or service used in, or intended for use in, interstate and foreign commerce.

> **RESPONSE**: Stingray Music denies the allegations in Paragraph 125.

126.    Stingray and Mood Media have misappropriated Dr. Hernandez's Trade Secrets in one or more of the following ways:

a) By acquiring Dr. Hernandez's Trade Secrets through improper means (e.g., misrepresentations, breach or inducement of a breach of a duty to maintain secrecy);

b) By disclosing and/or using Dr. Hernandez's Trade Secrets without Plaintiffs' consent;

c) By disclosing and/or using Dr. Hernandez's Trade Secrets without Plaintiffs' consent for their own commercial benefit while knowing, or having reason to know, at the time of the disclosure and/or use, that Dr. Hernandez's Trade Secrets were acquired through improper means;

d) By disclosing and/or using Dr. Hernandez's Trade Secrets without Plaintiffs' consent for their own commercial benefit while knowing, or having reason to know, at the time of the disclosure and/or use, that Dr. Hernandez's Trade Secrets were acquired under

circumstances giving rise to a duty to maintain the secrecy and limit the use of those trade secrets; and

e) By disclosing and/or using Dr. Hernandez's Trade Secrets without Plaintiffs' consent for their own commercial benefit while knowing, or having reason to know, at the time of the disclosure and/or use, that Dr. Hernandez's Trade Secrets were derived from or through a person who owed a duty to Plaintiffs to maintain the secrecy and limit the use of those Trade Secrets.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 126.

127.   Stingray and Mood Media took such actions willfully, maliciously, and/or in reckless disregard for Plaintiffs' rights, in that Stingray and Mood Media knew, or had reason to know, pursuant to the terms of agreement with Plaintiffs, that Stingray and Mood Media were not authorized to use Dr. Hernandez's Trade Secrets in competition with Plaintiffs or for Stingray's and Mood Media's own commercial benefit.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 127.

128.   As a result of Stingray's and Mood Media's misappropriation of Dr. Hernandez's Trade Secrets, Plaintiffs has suffered and will continue to suffer actual damages, and/or Stingray and Mood Media have been unjustly enriched, in an amount to be determined at trial.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 128.

129.   As a result of Stingray's and Mood Media's misappropriation of Dr. Hernandez's Trade Secrets, Plaintiffs have suffered and will continue to suffer irreparable harm if Stingray's and Mood Media's misconduct is not enjoined.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 129.

130.     Pursuant to 18 U.S.C. § 1836(b)(3)(C), Plaintiffs are entitled to exemplary damages for Stingray's and Mood Media's willful and malicious misappropriation of Dr. Hernandez's Trade Secrets.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 130.

131.     Pursuant to 18 U.S.C. § 1836(b)(3)(D), Plaintiffs are entitled to recovery of their attorneys' fees because of Stingray's and Mood Media's willful and malicious misappropriation of Dr. Hernandez's Trade Secrets.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 131.

**SECOND CAUSE OF ACTION**
**Violation of Florida Uniform Trade Secret Act, Fla. Stat. § 688 *et seq*.**
**(Against Stingray and Mood Media)**

132.     Plaintiffs incorporate paragraphs 1-122 as though fully set forth herein.

**RESPONSE**: Stingray Music incorporates its responses to Paragraphs 1-122 as if fully set forth herein.

133.     This is a cause of action for misappropriation of trade secrets under the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq*., based on the wrongful misappropriation, use, and/or disclosure of Dr. Hernandez's Trade Secrets, including but not limited to, source code, HTML and XML code, functional requirement specifications, operating procedures, automation validation test scripts, equipment listings, configuration specifications, all architecture methods and systems with encodings scripts, source code to generate screens, source code implementation on how "still images" were generated by the caching unit and broadcasted using an MPEG Transport Stream, use of multicast IP Addresses, GOP sizes, audio encoders levels, and information in the Asserted Patents before their public disclosure on June 30, 2016 (*see e.g.*,

**Exhibits 24-26**), and other highly confidential information that Stingray and Mood Media had access to via Mood Media's agreement with Plaintiffs.

<u>**RESPONSE**</u>: Stingray Music denies the allegations in Paragraph 133.

134.     Dr. Hernandez's Trade Secrets are trade secrets because they derive independent economic value from not being generally known to the public or to others who can obtain economic value from their disclosure or use, and they are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

<u>**RESPONSE**</u>: Stingray Music denies the allegations in Paragraph 134.

135.     Stingray and Mood Media gained access to Dr. Hernandez's Trade Secrets in the course of Mood Media's agreement with Plaintiffs, and Mood Media was under a contractual and fiduciary obligation to maintain the secrecy of Dr. Hernandez's Trade Secrets during the term of Mood Media's agreement with Plaintiffs and thereafter.

<u>**RESPONSE**</u>: Stingray Music denies the allegations in Paragraph 135.

136.     Plaintiffs took reasonable precautions to protect Dr. Hernandez's Trade Secrets, and Mood Media was subject to obligations to maintain their secrecy.

<u>**RESPONSE**</u>: Stingray Music denies the allegations in Paragraph 136.

137.     In violation of their obligations to maintain the secrecy of Dr. Hernandez's Trade Secrets, on information and belief, Stingray and Mood Media improperly acquired and/or disclosed Dr. Hernandez's Trade Secrets.

<u>**RESPONSE**</u>: Stingray Music denies the allegations in Paragraph 137.

138.     On information and belief, Stingray and Mood Media have used and/or disclosed and continue to use and disclose Dr. Hernandez's Trade Secrets, without Plaintiffs' consent or permission, in an attempt to benefit themselves.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 138.

139.    On information and belief, Stingray and Mood Media have used and/or disclosed Dr. Hernandez's Trade Secrets, maliciously and in willful and conscious disregard of the rights of Plaintiffs.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 139.

140.    As a direct and proximate result of Stingray's and Mood Media's willful, improper, and unlawful use and/or disclosure of Dr. Hernandez's Trade Secrets, Plaintiffs have suffered and continue to be damaged. Plaintiffs will continue to be irreparably damaged unless Stingray and Mood Media are enjoined from further use and disclosure of Dr. Hernandez's Trade Secrets, as provided by Fla. Stat. § 688.003.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 140 and denies that Plaintiffs are entitled to injunctive relief.

141.    The aforementioned acts of Stingray and Mood Media wrongfully misappropriating the Dr. Hernandez's Trade Secrets were and continue to be willful and malicious, warranting an award of exemplary damages, as provided by Fla. Stat. § 688.004, and an award of attorneys' fees, as provided by Fla. Stat. § 688.005.

**RESPONSE**: Stingray Music denies the allegations in Paragraph 141.

**THIRD CAUSE OF ACTION**
**Infringement of Patent No. 10,123,074**
**(Against all Defendants, except Stingray Music and Mood Media)**

142.    Plaintiffs incorporate paragraphs 1-122 as though fully set forth herein.

**RESPONSE**: Stingray Music incorporates its responses to Paragraphs 1-122 as if fully set forth herein.

143.    The '074 patent is attached to this Complaint as **Exhibit 1**.

**RESPONSE**: Paragraph 143 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

144.    Dr. Hernandez is the owner of all rights, title and interests to the '074 Patent, including the right to bring this suit for injunctive relief and damages.

**RESPONSE**: Paragraph 144 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

145.    The '074 patent is valid and enforceable.

**RESPONSE**: Paragraph 145 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

146.    On information and belief, Defendants make, use, offer for sale, sell, or import certain services and products, including but not limited to the use of UbiquiCAST OSE2 ("Accused Streaming Platforms"), to provide streaming music to Cable TV Operators, IPTV systems, and OTT Service Providers in the United States and in this District that directly infringe one or more claims of the '074 Patent, literally or under the doctrine of equivalents, including at least claims 1 to 19 of the '074 Patent as set forth in the preliminary infringement claim chart attached as **Exhibit 24**.

**RESPONSE**: Paragraph 146 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

147.    On information and belief, Defendants manufacture, or contract with vendors and others to manufacture, use and distribute the Accused Streaming Platforms. Within this jurisdiction and elsewhere, Defendants and their employees, agents and affiliates use the Accused Streaming Platforms in connection with their design, development, testing and maintenance of the Accused

Streaming Platforms as well as in connection the use of the Accused Streaming Platforms by their employees, agents, affiliates, and customers.

**RESPONSE**: Paragraph 147 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

148.   On information and belief, Defendants further provide and distribute, or contract with others to provide and distribute, the Accused Streaming Platforms. Customers and/or end users use Accused Streaming Platforms in accordance with Defendants' provided instructions, terms, and conditions.

**RESPONSE**: Paragraph 148 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

149.   To the extent that some elements or steps of a claim in the '074 patent are performed or provided by a different party than Defendants, those elements or steps are attributable to the Defendants because Defendants participate in the infringement (as described above and herein) and such parties receive a benefit upon use and performance of the claimed systems and methods of the '074 patent. In particular, Defendants establish the manner and/or timing of the performance of the use of Defendants Accused Streaming Platforms and thus direct and control the actions that a user may request or the results from a user's actions. Defendants' customers and users receive a benefit in that they are able stream audio content (e.g., music). Defendants' contracts with users also create an agency relationship or govern infringing activity for purposes of joint infringement.

**RESPONSE**: Paragraph 149 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

150.   On information and belief, in accordance with Defendants' instructions, Defendants' customers and other end users use the Accused Streaming Platforms in a way that

practice the claimed methods of the '074 patent as set forth above. Through their software and hardware on Defendants' equipment, as well as their contractual relationships with users, Defendants thus direct and control users to perform acts of infringement alleged above.

**RESPONSE**: Paragraph 150 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

151.    On information and belief, Defendants enter into agreements with customers and/or end users and others and condition their use of Defendants' Accused Streaming Platforms and its functionality upon consent with Defendants' Terms and Conditions and Privacy Policies, within this jurisdiction and elsewhere.

**RESPONSE**: Paragraph 151 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

152.    On information and belief, at least since November 11, 2019, Defendants have knowingly and actively induced the infringement of one or more of the '074 patent claims by, inter alia, marketing, promoting, and offering for use the Accused Streaming Platforms, knowingly and intending that the use of such instrumentalities by Defendants' customers and by users infringes the '074 patent. For example, Defendants intend to induce such infringement by, among other things, promoting users to use the Accused Streaming Platforms knowing that its use infringes one or more claims of the '074 patent.

**RESPONSE**: Paragraph 152 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

153.    On information and belief, at least since November 11, 2019, Defendants have contributed to the infringement of the '074 patent by, inter alia, marketing and promoting the Accused Streaming Platforms. Defendants have used and promoted within the United States the

Accused Streaming Platforms. By virtue of incorporating the patented technology described above, the Accused Streaming Platforms are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendants to be especially made or especially adapted to the infringe the '074 patent. As a result, Defendants' Accused Streaming Platforms have been used by their customers and by users to infringe the '074 patent. Defendants continue to engage in acts of contributory infringement of the '074 patent.

**RESPONSE**: Paragraph 153 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

154.    Plaintiffs, under 35 U.S.C. § 284, may recover damages adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the Court.

**RESPONSE**: Paragraph 154 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

155.    Defendants infringe and continue to infringe after knowledge of the '074 Patent, such infringement is deliberate, knowing, and willful under 35 U.S.C § 284, entitling Plaintiffs to treble damages.

**RESPONSE**: Paragraph 155 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

156.    The Court should declare this an exceptional case under 35 U.S.C. § 285, entitling Plaintiffs to recover their attorneys' fees.

**RESPONSE**: Paragraph 156 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

157.    Defendants threaten to continue to engage in the acts complained of herein and, unless restrained and enjoined, will continue to do so, all to Plaintiffs' irreparable injury. It would be difficult to ascertain the amount of compensation that would afford Plaintiffs adequate relief for such future and continuing acts, and a multiplicity of judicial proceedings would be required. Plaintiffs do not have an adequate remedy at law to compensate it for the injuries threatened.

**RESPONSE**: Paragraph 157 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

**FOURTH CAUSE OF ACTION**
**Infringement of Patent No. 10,524,002**
**(Against all defendants, except Stingray Music and Mood Media)**

158.    Plaintiffs incorporate paragraphs 1-122 as though fully set forth herein.

**RESPONSE**: Stingray Music incorporates its responses to Paragraphs 1-122 as if fully set forth herein.

159.    The '002 Patent is attached to this Complaint as **Exhibit 2**.

**RESPONSE**: Paragraph 159 does not require a response because Plaintiffs have not asserted the Third Cause of Action against Stingray Music.

160.    Dr. Hernandez is the owner of all rights, title and interests to the '002 Patent, including the right to bring this suit for injunctive relief and damages.

**RESPONSE**: Paragraph 160 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

161.    The '002 patent is valid and enforceable.

**RESPONSE**: Paragraph 161 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

162.    On information and belief, Defendants make, use, offer for sale, sell, or import certain services and products, including but not limited to the use Accused Streaming Platforms to provide streaming music to Cable TV Operators, IPTV systems, and OTT Service Providers in the United States and in this District that directly infringe one or more claims of the '002 Patent, literally or under the doctrine of equivalents, including at least claims 1-2 and 4-9 of the '002 Patent as set forth in the preliminary infringement claim chart attached as **Exhibit 25**.

**RESPONSE**: Paragraph 162 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

163.    On information and belief, Defendants manufacture, or contract with vendors and others to manufacture, use and distribute the Accused Streaming Platforms. Within this jurisdiction and elsewhere, Defendants and their employees, agents and affiliates use the Accused Streaming Platforms in connection with their design, development, testing and maintenance of the Accused Streaming Platforms as well as in connection the use of the Accused Streaming Platforms by their employees, agents, affiliates, and customers.

**RESPONSE**: Paragraph 163 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

164.    On information and belief, Defendants further provide and distribute, or contract with others to provide and distribute, the Accused Streaming Platforms. Customers and/or end users use Accused Streaming Platforms in accordance with Defendants' provided instructions, terms, and conditions.

**RESPONSE**: Paragraph 164 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

165.     To the extent that some elements or steps of a claim in the '002 Patent are performed or provided by a different party than Defendants, those elements or steps are attributable to the Defendants because Defendants participate in the infringement (as described above and herein) and such parties receive a benefit upon use and performance of the claimed systems and methods of the '002 Patent. In particular, Defendants establish the manner and/or timing of the performance of the use of Defendants Accused Streaming Platforms and thus direct and control the actions that a user may request or the results from a user's actions. Defendants' customers and users receive a benefit in that they are able stream audio content (e.g., music). Defendants' contracts with users also create an agency relationship or govern infringing activity for purposes of joint infringement.

**RESPONSE**: Paragraph 165 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

166.     On information and belief, in accordance with Defendants' instructions, Defendants' customers and other end users use the Accused Streaming Platforms in a way that practice the claimed methods of the '002 Patent as set forth above. Through their software and hardware on Defendants' equipment, as well as their contractual relationships with users, Defendants thus direct and control users to perform acts of infringement alleged above.

**RESPONSE**: Paragraph 166 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

167.     On information and belief, Defendants enter into agreements with customers and/or end users and others and condition their use of Defendants' Accused Streaming Platforms and its functionality upon consent with Defendants' Terms and Conditions and Privacy Policies, within this jurisdiction and elsewhere.

**RESPONSE**: Paragraph 167 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

168.    On information and belief, at least since January 1, 2020, Defendants have knowingly and actively induced the infringement of one or more of the '002 Patent claims by, inter alia, marketing, promoting, and offering for use the Accused Streaming Platforms, knowingly and intending that the use of such instrumentalities by Defendants' customers and by users infringes the '002 Patent. For example, Defendants intend to induce such infringement by, among other things, promoting users to use the Accused Streaming Platforms knowing that its use infringes one or more claims of the '002 Patent.

**RESPONSE**: Paragraph 168 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

169.    On information and belief, at least since January 1, 2020, Defendants have contributed to the infringement of the '002 Patent by, inter alia, marketing and promoting the Accused Streaming Platforms. Defendants have used and promoted within the United States the Accused Streaming Platforms. By virtue of incorporating the patented technology described above, the Accused Streaming Platforms are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendants to be especially made or especially adapted to the infringe the '002 Patent. As a result, Defendants' Accused Streaming Platforms have been used by their customers and by users to infringe the '002 Patent. Defendants continue to engage in acts of contributory infringement of the '002 Patent.

**RESPONSE**: Paragraph 169 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

170.     Plaintiffs, under 35 U.S.C. § 284, may recover damages adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the Court.

**RESPONSE**: Paragraph 170 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

171.     Defendants infringe and continue to infringe after knowledge of the '002 Patent, such infringement is deliberate, knowing, and willful under 35 U.S.C § 284, entitling Plaintiffs to treble damages.

**RESPONSE**: Paragraph 171 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

172.     The Court should declare this an exceptional case under 35 U.S.C. § 285, entitling Plaintiffs to recover their attorneys' fees.

**RESPONSE**: Paragraph 172 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

173.     Defendants threaten to continue to engage in the acts complained of herein and, unless restrained and enjoined, will continue to do so, all to Plaintiffs' irreparable injury. It would be difficult to ascertain the amount of compensation that would afford Plaintiffs adequate relief for such future and continuing acts, and a multiplicity of judicial proceedings would be required. Plaintiffs do not have an adequate remedy at law to compensate it for the injuries threatened.

**RESPONSE**: Paragraph 173 does not require a response because Plaintiffs have not asserted the Fourth Cause of Action against Stingray Music.

## FIFTH CAUSE OF ACTION
### Infringement of Patent No. 11,140,441
### (Against all Defendants, except Stingray Music and Mood Media)

174.     Plaintiffs incorporate paragraphs 1-122 as though fully set forth herein.

**RESPONSE**: Stingray Music incorporates its responses to Paragraphs 1-122 as if fully set forth herein.

175.     The '441 Patent is attached to this Complaint as **Exhibit 3**.

**RESPONSE**: Paragraph 175 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

176.     Dr. Hernandez is the owner of all rights, title and interests to the '441 Patent, including the right to bring this suit for injunctive relief and damages.

**RESPONSE**: Paragraph 176 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

177.     The '441 Patent is valid and enforceable.

**RESPONSE**: Paragraph 177 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

178.     On information and belief, Defendants make, use, offer for sale, sell, or import certain services and products, including but not limited to the use of Accused Streaming Platforms to provide streaming music to Cable TV Operators, IPTV systems, and OTT Service Providers in the United States and in this District that directly infringe one or more claims of the '441 Patent, literally or under the doctrine of equivalents, including at least claims 1-14 and 16-26 of the '441 Patent as set forth in the preliminary infringement claim chart attached as **Exhibit 26**.

**RESPONSE**: Paragraph 178 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

179.     On information and belief, Defendants manufacture, or contract with vendors and others to manufacture, use and distribute the Accused Streaming Platforms. Within this jurisdiction

and elsewhere, Defendants and their employees, agents and affiliates use the Accused Streaming Platforms in connection with their design, development, testing and maintenance of the Accused Streaming Platforms as well as in connection the use of the Accused Streaming Platforms by their employees, agents, affiliates, and customers.

**RESPONSE**: Paragraph 179 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

180.    On information and belief, Defendants further provide and distribute, or contract with others to provide and distribute, the Accused Streaming Platforms. Customers and/or end users use Accused Streaming Platforms in accordance with Defendants' provided instructions, terms, and conditions.

**RESPONSE**: Paragraph 180 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

181.    To the extent that some elements or steps of a claim in the '441 Patent are performed or provided by a different party than Defendants, those elements or steps are attributable to the Defendants because Defendants participate in the infringement (as described above and herein) and such parties receive a benefit upon use and performance of the claimed systems and methods of the '441 Patent. In particular, Defendants establish the manner and/or timing of the performance of the use of Defendants Accused Streaming Platforms and thus direct and control the actions that a user may request or the results from a user's actions. Defendants' customers and users receive a benefit in that they are able stream audio content (e.g., music). Defendants' contracts with users also create an agency relationship or govern infringing activity for purposes of joint infringement.

**RESPONSE**: Paragraph 181 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

182.    On information and belief, in accordance with Defendants' instructions, Defendants' customers and other end users use the Accused Streaming Platforms in a way that practice the claimed methods of the '441 Patent as set forth above. Through their software and hardware on Defendants' equipment, as well as their contractual relationships with users, Defendants thus direct and control users to perform acts of infringement alleged above.

**RESPONSE**: Paragraph 182 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

183.    On information and belief, Defendants enter into agreements with customers and/or end users and others and condition their use of Defendants' Accused Streaming Platforms and its functionality upon consent with Defendants' Terms and Conditions and Privacy Policies, within this jurisdiction and elsewhere.

**RESPONSE**: Paragraph 183 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

184.    On information and belief, at least since the filing of the original complaint, Defendants have knowingly and actively induced the infringement of one or more of the '441 Patent claims by, inter alia, marketing, promoting, and offering for use the Accused Streaming Platforms, knowingly and intending that the use of such instrumentalities by Defendants' customers and by users infringes the '441 Patent. For example, Defendants intend to induce such infringement by, among other things, promoting users to use the Accused Streaming Platforms knowing that its use infringes one or more claims of the '441 Patent.

**RESPONSE**: Paragraph 184 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

185.    On information and belief, at least since the filing of the original complaint, Defendants have contributed to the infringement of the '441 Patent by, inter alia, marketing and promoting the Accused Streaming Platforms. Defendants have used and promoted within the United States the Accused Streaming Platforms. By virtue of incorporating the patented technology described above, the Accused Streaming Platforms are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendants to be especially made or especially adapted to the infringe the '441 Patent. As a result, Defendants' Accused Streaming Platforms have been used by their customers and by users to infringe the '441 Patent. Defendants continue to engage in acts of contributory infringement of the '441 Patent.

**RESPONSE**: Paragraph 185 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music..

186.    Plaintiffs, under 35 U.S.C. § 284, may recover damages adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the Court.

**RESPONSE**: Paragraph 186 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

187.    Defendants infringe and continue to infringe after knowledge of the '441 Patent, such infringement is deliberate, knowing, and willful under 35 U.S.C § 284, entitling Plaintiffs to treble damages.

**RESPONSE**: Paragraph 187 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

188.    The Court should declare this an exceptional case under 35 U.S.C. § 285, entitling Plaintiffs to recover their attorneys' fees.

**RESPONSE**: Paragraph 188 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

189.    Defendants threaten to continue to engage in the acts complained of herein and, unless restrained and enjoined, will continue to do so, all to Plaintiffs' irreparable injury. It would be difficult to ascertain the amount of compensation that would afford Plaintiffs adequate relief for such future and continuing acts, and a multiplicity of judicial proceedings would be required. Plaintiffs do not have an adequate remedy at law to compensate it for the injuries threatened.

**RESPONSE**: Paragraph 189 does not require a response because Plaintiffs have not asserted the Fifth Cause of Action against Stingray Music.

<u>**SIXTH CAUSE OF ACTION**</u>
<u>**Breach of Contract**</u>
<u>**(Against Mood Media)**</u>

190.    Plaintiffs incorporate paragraphs 1-122 as though fully set forth herein.

**RESPONSE**: Stingray Music incorporates its responses to Paragraphs 1-122 as if fully set forth herein.

191.    Plaintiffs and Mood Media (acting through its business DMX) entered into a Non-Disclosure Agreement (NDA), a term sheet, and a mutual release/settlement agreement.

**RESPONSE**: Paragraph 191 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

192.    The NDA, term sheet and mutual release/settlement agreement are valid and enforceable contracts between Plaintiffs and Mood Media.

**RESPONSE**: Paragraph 192 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

193.    Mood Media terminated the term sheet agreement with Plaintiffs without cause and in violation of the terms of this agreement.

**RESPONSE**: Paragraph 193 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

194.    The NDA and term sheet agreement prohibited the disclosure, transfer, and use of Dr. Hernandez's confidential information to any other party other than Mood Media/DMX, which are material terms of both agreements. Mood Media violated the NDA and term sheet by transferring Dr. Hernandez's confidential information to Stingray and/or allowing Stingray to use Dr. Hernandez's confidential information.

**RESPONSE**: Paragraph 194 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

195.    Plaintiffs and Mood Media entered into a settlement agreement whereby Mood Media agreed not to disclose any of Plaintiffs' confidential information, including its trade secrets, with Stingray. Mood Media breached this agreement by disclosing Plaintiffs' confidential information to Stingray.

**RESPONSE**: Paragraph 195 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

196.    Mood Media's breaches are without excuse under law or contract.

**RESPONSE**: Paragraph 196 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

197.    Plaintiffs have fully performed all of its obligations and satisfied all conditions for performance under the NDA, term sheet and settlement agreement.

**RESPONSE**: Paragraph 197 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

198.    Mood Media has willfully, and with conscious disregard for the contractual obligations owed to Plaintiffs, breached the NDA, term sheet and settlement agreement.

**RESPONSE**: Paragraph 198 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

199.    Unless restrained and enjoined by the Court, Mood Media will continue to breach the NDA, term sheet and settlement agreement.

**RESPONSE**: Paragraph 199 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

200.    As a foreseeable, direct and proximate result of Mood Media's breach of contract, and their breach was a substantial factor in causing Plaintiffs to suffer irreparable injury to its rights and pecuniary damages. Plaintiffs have been, and will continue to, suffer such injury, loss, and damage by the breaches described herein.

**RESPONSE**: Paragraph 200 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

201.    But for Mood Media's breach of contract, Plaintiffs would not have been injured by their disclosure of Plaintiffs' confidential information, including Dr. Hernandez's Trade Secrets.

**RESPONSE**: Paragraph 201 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

202.     Mood Media has derived and received and will continue to derive and receive from the aforementioned breach of contract, gains, profits, and advantages, many of which are not known to Plaintiffs.

**RESPONSE**: Paragraph 202 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

203.     Plaintiffs are entitled to injunctive relief as well as damages, the nature and extent of which will be proved at trial.

**RESPONSE**: Paragraph 203 does not require a response because Plaintiffs have not asserted the Sixth Cause of Action against Stingray Music.

### RESPONSE TO PLAINTIFFS' PRAYER FOR RELIEF

204.     Stingray Music denies that Plaintiffs are entitled to any of the relief requested in their Prayer for Relief.

### RESPONSE TO PLAINTIFFS' DEMAND FOR JURY TRIAL

205.     Stingray Music admits that Plaintiffs demand a trial by jury on all issues so triable in this action. Stingray Music also demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

### AFFIRMATIVE DEFENSES

206.     Pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, and without assuming any burden it would not otherwise bear, Stingray Music currently asserts the following defenses to Plaintiffs' Fourth Amended Complaint. Stingray Music reserves the right to amend its Answer with additional defenses as further information is obtained. In the event that any of these affirmative defenses are more properly counterclaims then they are hereby designated as such.

## FIRST AFFIRMATIVE DEFENSE
## (STATUTES OF LIMITATIONS)

207.    Plaintiffs' causes of action are barred, in whole or in part, by the applicable statutes of limitations.

## SECOND AFFIRMATIVE DEFENSE
## (PREEMPTION)

208.    Plaintiffs' causes of action are barred, in whole or in part, as preempted.

## THIRD AFFIRMATIVE DEFENSE
## (EQUITABLE DEFENSES)

209.    Plaintiffs' causes of action are barred, in whole or in part, by estoppel, acquiescence, waiver, laches, unclean hands, or other equitable defenses.

## FOURTH AFFIRMATIVE DEFENSE
## (FAILURE TO STATE A CLAIM)

210.    Plaintiffs do not state a plausible claim for relief.

## FIFTH AFFIRMATIVE DEFENSE
## (NO INJUNCTIVE RELIEF)

211.    Plaintiffs are not entitled to an injunction against Stingray Music under any theory because Plaintiffs have not and will not suffer immediate or irreparable harm, Plaintiffs do not compete with Stingray Music, Plaintiffs are not without an adequate remedy at law, and public policy concerns weigh against any equitable relief.

## SIXTH AFFIRMATIVE DEFENSE
## (NO UNAUTHORIZED ACCESS)

212.    Plaintiffs' causes of action for trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and the Florida Uniform Trade Secret Act, Fla. Stat. § 688, *et seq.*, are barred, in whole or in part, because Stingray Music did not have unauthorized access to Plaintiffs' alleged trade secrets.

## SEVENTH AFFIRMATIVE DEFENSE
### (RELEASE)

213.    Plaintiffs' causes of action are barred, in whole or in part, because Plaintiffs released their claims.

## RESERVATION OF RIGHTS

214.    Stingray Music reserves the right to amend its Answer and Affirmative Defenses and reserves any and all additional defenses available to it under the Federal Rules of Civil Procedure including any defenses set out in Rule 8(c), the Local Rules of this District and this Court, Florida law, or otherwise in law or equity, now existing or later arising, as may be discovered or become applicable throughout discovery or otherwise in the course of litigation.

## JURY DEMAND

Stingray Music demands a trial by jury on all issues so triable raised by the Fourth Amended Complaint or by Stingray Music's Answer and Affirmative Defenses.

## PRAYER FOR RELIEF

WHEREFORE, Stingray Music prays the Court enter judgment in its favor and against Plaintiffs as follows:

A.    Dismissing the Fourth Amended Complaint in its entirety with prejudice;

B.    Denying all relief that Plaintiffs seek in their Fourth Amended Complaint, at law or in equity, including an award of monetary damages, injunctive relief, or any other relief whatsoever;

C.    Declaring that no damages or royalties are due or owing for any of the acts alleged by Plaintiffs against Stingray Music in the Fourth Amended Complaint;

D.    Awarding Stingray Music any attorneys' fees it may be entitled to under applicable fee-shifting provisions;

E.      Finding this case to be exceptional under 35 U.S.C. § 285 and awarding Stingray

Music all reasonable costs, experts' fees, and attorneys' fees, and;

F.      Awarding any such other and further relief as the Court may deem just and

equitable.

Dated: June 3, 2025                        Respectfully submitted,

                                           */s/ Allison Henry*
                                           Jorge Mestre
                                           jmestre@riveromestre.com
                                           Florida Bar No. 88145
                                           Allison Henry
                                           ahenry@riveromestre.com
                                           Florida Bar No. 1003008
                                           **RIVERO MESTRE LLP**
                                           2525 Ponce de Leon Boulevard, Suite 1000
                                           Miami, Florida 33134
                                           Telephone: (305) 445-2500
                                           Facsimile: (305) 445-2505

                                           */s/ Demetrios Anaipakos*
                                           Demetrios Anaipakos *(pro hac vice)*
                                           Texas Bar No. 00793258
                                           danaipakos@aatriallaw.com
                                           Amir H. Alavi *(pro hac vice)*
                                           Texas Bar No. 00793239
                                           aalavi@aatriallaw.com
                                           Michael McBride *(pro hac vice)*
                                           Texas Bar No. 24065700
                                           mmcbride@aatriallaw.com
                                           Steven Jugle *(pro hac vice)*
                                           Texas Bar No. 24083280
                                           sjugle@aatriallaw.com
                                           Masood Anjom *(pro hac vice)*
                                           Texas Bar No. 24055107
                                           manjom@aatriallaw.com
                                           Justin Chen *(pro hac vice)*
                                           Texas Bar No. 24074024
                                           jchen@aatriallaw.com
                                           Connie Flores Jones *(pro hac vice)*
                                           Texas Bar No. 00793736
                                           cfloresjones@aatriallaw.com
                                           **ALAVI & ANAIPAKOS PLLC**
                                           609 Main Street, Suite 3200

Houston, Texas 77002
Telephone:  (713) 751-2362
Facsimile:  (713) 751-2341

*Counsel for Stingray Music USA, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing

document was filed electronically in compliance with Local Rules 5.2(a) on June 3, 2025. As such,

this document was served on all counsel of record pursuant to Local Rules 5.2(a) and the Federal

Rules of Civil Procedure.


*/s/ Allison Henry*
Allison Henry