IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:24-CV-21226-ELA

DR. EDWIN A. HERNANDEZ and
EGLA CORP.,

                                             **JURY TRIAL DEMANDED**

    *Plaintiffs*,

    v.

STINGRAY GROUP, INC. f/k/a
STINGRAY DIGITAL GROUP, INC.,
STINGRAY MUSIC USA, INC.,
MOOD MEDIA LLC f/k/a MOOD
MEDIA CORPORATION, AT&T
ENTERPRISES, LLC f/k/a AT&T
CORP., MILLICOM
INTERNATIONAL SERVICES, LLC,
and BLUE STREAM
COMMUNICATIONS, LLC dba
BLUE STREAM FIBER,

    *Defendants*.

_____

**MOOD MEDIA'S (SECOND) MOTION AND**
**MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................................... 2

        A.      The parties' relationship deteriorated in April 2014 because Hernandez
                believed (mistakenly) that his technology was somehow involved in an
                asset-purchase agreement between Mood Media and Stingray. ........................... 2

        B.      In April 2024, Plaintiffs sued Mood Media, but no facts exist to support
                the allegation that Mood Media disclosed Plaintiffs' trade secrets or
                confidential information to Stingray. ..................................................................... 4

        C.      Lacking any evidence of any improper disclosure, Plaintiffs pivoted from
                their original *disclosure* theory of wrongdoing to a new *hacking* theory. .............. 7

        D.      Plaintiffs lack evidence of any alleged hack—candidly conceding that they
                do not know *who* supposedly hacked their servers, *which* server was
                allegedly hacked, nor *when* that unknown hack supposedly occurred. ................. 8

III.    LEGAL STANDARD .................................................................................................. 10

IV.     ARGUMENT .............................................................................................................. 11

        A.      Mood Media is entitled to summary judgment on Plaintiffs' trade-secret
                claims (Counts 1 and 2) because there is no record evidence that the
                alleged trade secrets in Plaintiffs' source code were misappropriated. ................ 11

                1.      Mood Media never had access to Plaintiffs' source code, so Mood
                        Media could not use that source code in any of its own products nor
                        disclose that source code to Stingray. ....................................................... 12

                2.      Plaintiffs have no evidence that Stingray hacked into Plaintiffs'
                        servers, let alone that Mood Media was somehow complicit in that
                        (alleged) hack. ........................................................................................... 14

        B.      Mood Media is entitled to summary judgment on Plaintiffs' breach-of-
                contract claim (Count 6) because there is no evidence that Mood Media
                improperly disclosed any confidential information to Stingray. ......................... 17

                1.      The presentations, documents, and emails Plaintiffs provided to
                        Mood Media do not contain any of Plaintiffs' alleged trade secrets. ....... 17

                2.      There is no evidence Mood Media improperly disclosed Plaintiffs'
                        source code, or any other confidential materials, to Stingray.................. 18

V.      CONCLUSION............................................................................................................ 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...............................................................................................10, 11

*Axiom Worldwide, Inc. v. HTRD Grp. Hong Kong Ltd.*,
   No. 8:11-cv-1468-T-33TBM, 2013 WL 2712787 (M.D. Fla. June 12, 2013)........................13

*Border Collie Rescue, Inc. v. Ryan*,
   418 F.Supp.2d 1330 (M.D. Fla. Feb. 28, 2006)...............................................................15, 16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...............................................................................................10, 11

*Compulife Software Inc. v. Newman*,
   959 F.3d 1288 (11th Cir. 2020) ...............................................................................12

*Cordoba v. Dillard's, Inc.*,
   419 F.3d 1169 (11th Cir. 2005) ...............................................................................11

*Daneshpajouh v. Sage Dental Grp. of Florida, PLLC*,
   No. 19-cv-62700-RAR, 2021 WL 3674655 (S.D. Fla. Aug. 18, 2021)................................10

*Gonzalez v. Lee Cnty. Hous. Auth.*,
   161 F.3d 1290 (11th Cir. 1998) ...............................................................................11

*HCC Ins. Holdings, Inc. v. Flowers*,
   237 F.Supp.3d 1341 (N.D. Ga. 2017) ......................................................................12

*Mann v. Taser Int'l, Inc.*,
   588 F.3d 1291 (11th Cir. 2009) ...............................................................................10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)...............................................................................................10, 11

*Sterpetti v. E-Brands Acquisition, LLC*,
   6:04-cv-01843-ORL-3DA, 2006 WL 1046949 (M.D. Fla. Apr. 20, 2006)...........................14

*Vega v. T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) ...............................................................................17

*Yauld Enters., Inc. v. Bars Distrib., LLC*,
    No. 11-60075-CIV-SEITZ/SIMONTON, 2011 WL 13217290 (S.D. Fla. Oct.
    31, 2011) .................................................................................................................15, 16

*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*,
    898 F.3d 1279 (11th Cir. 2018) ..........................................................................11

**Statutes**

18 U.S.C. § 1839(5) ...........................................................................................................12

Defend Trade Secrets Act ..................................................................................................12

Fla. Stat. § 688.002(2)........................................................................................................12

Florida Uniform Trade Secrets Act.....................................................................................11

**Other Authorities**

Fed. R. Civ. P. 56 ................................................................................................................1

Fed. R. Civ. P. 56(a) ........................................................................................................10

Fed. R. Civ. P. 56(b) ........................................................................................................10

Local Rule 56.1 ..............................................................................................................1, 3

Local Rule 56.1(c) ...........................................................................................................10

In accordance with Rule 56 of the Federal Rule of Civil Procedure, Local Rule 56.1, the July 9, 2025 Amended Scheduling Order (Dkt. No. 302 at 2 ¶ 2), and Judge Torres's September 10, 2025 Order (Dkt. No. 349 at 7 ¶ 4), Mood Media moves for summary judgment on all of Plaintiffs' claims against Mood Media (Counts 1, 2, and 6).

## I.     INTRODUCTION

After thirteen months of discovery, Plaintiffs do not have a shred of evidence to substantiate their allegations of trade-secret misappropriation and breach of confidentiality. They initially alleged that Mood Media supposedly *disclosed* the (alleged) trade secrets to Stingray. But, lacking any evidence of such a disclosure, Plaintiffs pivoted during discovery to a new *hacking* theory—i.e., that Stingray supposedly hacked into Plaintiffs' servers to steal their source code. The problem for Plaintiffs is that no evidence exists to support that wild accusation. Plaintiffs cannot say *who* allegedly hacked their servers, *which* server was allegedly hacked, nor *when* that hack supposedly occurred. The only so-called evidence of a hack that Plaintiffs can muster is something called a Trello ticket. But Hernandez conceded that the Trello tickets do not—by themselves—show that Stingray hacked into Plaintiffs' servers. Nor do those Trello tickets have anything to do with Mood Media.

No record evidence exists to support Plaintiffs' claims because those claims have *never* had any merit. And that is precisely what Defendants have consistently told Plaintiffs since April 2014, when they first accused Defendants of wrongdoing. But rather than accept this reality, Plaintiffs have repeatedly sought do-overs on their claims. Their first do-over occurred when they sued Mood Media here and re-asserted claims they had released in October 2014 by entering into a Settlement and Mutual Release Agreement ("2014 Mutual Release"). Plaintiffs' next do-over occurred in the middle of discovery when they pivoted from their original *disclosure* theory of wrongdoing to their now-asserted *hacking* theory. And Plaintiffs' most

recent do-over occurred on the last day of discovery when they requested additional source-code inspections, supplemental expert reports, and new depositions. Dkt. No. 371. But that requested discovery is unwarranted and extremely prejudicial. Dkt. Nos. 373 & 376.

After a year and a half of litigating this case—a case that should have never been filed and that has cost Mood Media over $2.5 million to defend—Mood Media is entitled to summary judgment for at least two reasons. *First*, there is no record evidence to support Counts 1 and 2 that Mood Media misappropriated Plaintiffs' source code. Mood Media never had access to that source code, so they could not possibly use it in their products nor disclose it to Stingray. And no record evidence exists that Stingray hacked into Plaintiffs' servers, let alone that Mood Media was somehow complicit in this (imaginary) hack. *Second*, there is no record evidence to support Count 6 that Mood Media improperly disclosed Plaintiffs' confidential information to Stingray. The presentations, documents, and emails that Plaintiffs shared with Mood Media when the parties worked together do not contain the trade secrets at issue in this case. And, even if those materials did contain Plaintiffs' alleged trade secrets, there is no evidence that Mood Media improperly disclosed those materials to Stingray. For at least these reasons, the Court should grant summary judgment and put an end to this frivolous case.

## II.     FACTUAL BACKGROUND

### A.     The parties' relationship deteriorated in April 2014 because Hernandez believed (mistakenly) that his technology was somehow involved in an asset-purchase agreement between Mood Media and Stingray.

Mood Media provides music services to businesses and residential locations. Statement of Undisputed Material Facts ("SUMF") ¶ 1. In early 2013, Mood Media and EGLA entered into a Term Sheet for EGLA to provide Mood Media with "a multimedia device," called MediaPlug, which was a server to be installed at cable operators' locations in Latin America to allow those cable operators to distribute Mood Media's music content to residential customers in Latin

American via the cable operators' networks.[1] SUMF ¶¶ 4–5.

Mood Media's relationship with Plaintiffs began to deteriorate around March 2014, when Hernandez "discovered" an asset-purchase agreement between Mood Media and Stingray. SUMF ¶ 16. Hernandez believed (mistakenly) that his technology was somehow involved in that asset-purchase agreement. SUMF ¶ 18. It was not. SUMF ¶¶ 10–14. Instead, Mood Media sold certain *customer contracts* to Stingray. SUMF ¶ 13. Stingray used its own equipment to service those newly acquired customers. SUMF ¶ 14. Mood Media did ***not*** provide any of EGLA's MediaPlug servers—or any other EGLA equipment—to Stingray as part of the asset-purchase agreement. *Id.* In fact, the asset-purchase agreement "specifically spelled out that the EGLA contract and agreement was not part of that acquisition." SUMF ¶ 15; *see also* SUMF Ex. 3 at MoodMedia-0000043 ("The parties to this Definitive Agreement agree that the Transaction contemplated by the Definitive agreement and the sale of the Business by the Seller to the Purchasers does not include . . . the contract by and between the Seller and EGLA Communications[.]").

Nonetheless, without identifying any specific conduct or factual support, Hernandez emailed Mood Media on April 14, 2014, alleging that "the NDA in place with MOOD MEDIA has been breached" and that "Stingray effectively has been making use and gaining access of EGLA's intellectual property assets and trade secrets without proper authorization." SUMF ¶ 18. In fact, Hernandez even emailed the Department of Homeland Security, alleging that Mood Media and Stingray had engaged in "Intellectual Property T[h]eft." SUMF ¶ 19. Mood Media

---

[1] The relationship between Plaintiffs and Mood Media began with Mood Media's predecessor-in-interest, DMX. SUMF ¶ 2. But DMX was acquired by Mood Media, so "the nascent relationship between DMX and Dr. Hernandez was formalized with Mood Media." SUMF ¶ 3.

(truthfully) denied those allegations, SUMF ¶ 20, because Mood Media never had access to any of EGLA's source code, SUMF ¶¶ 10–11, and never transferred any of EGLA's equipment or other confidential information to Stingray, SUMF ¶¶ 13–14.

A few weeks later, on April 24, 2014, Mood Media "officially terminat[ed] the Term Sheet" with EGLA. SUMF ¶ 21. But Hernandez continued to raise concerns about certain unpaid invoices under the Term Sheet. SUMF ¶ 22. To resolve that issue and all other disputes between the parties, in October 2014, Mood Media and EGLA entered into the 2014 Mutual Release, whereby they released any and all claims against each other. SUMF ¶¶ 23–26; SUMF Ex. 5.[2]

**B.    In April 2024, Plaintiffs sued Mood Media, but no facts exist to support the allegation that Mood Media disclosed Plaintiffs' trade secrets or confidential information to Stingray.**

Plaintiffs sued Mood Media on April 2, 2024—nearly a decade after releasing all claims against Mood Media by signing the 2014 Mutual Release. SUMF ¶ 27. The now-asserted claims against Mood Media—trade-secret misappropriation (Counts 1 and 2) and breach of contract (Count 6)—all arise from the Term Sheet.[3] SUMF ¶ 28.

Plaintiffs' theory of the alleged misappropriation and breach has morphed over time. They initially alleged that Mood Media (supposedly) "provide[d] Stingray with access to Dr. Hernandez's Trade Secrets." SUMF ¶ 28. But Plaintiffs gave no factual support for that

---

[2] Because Plaintiffs accused Mood Media of trade-secret misappropriation and breach of confidentiality back in April 2014 and later settled those claims in October 2014, Mood Media filed a first summary-judgment motion on three grounds: (1) Plaintiffs' claims are time-barred by the relevant statutes of limitation; (2) Plaintiffs claims are barred by the parties' 2014 Mutual Release; and (3) Plaintiffs' claims here are a material breach of the parties' 2014 Mutual Release. Dkt. No. 304. Judge Torres recommended denying that motion. Dkt. No. 350. Mood Media objected. Dkt. No. 354. Those objections are pending resolution by the Court.

[3] Plaintiffs' patent-infringement claims (Counts 3, 4, and 5) are not asserted against Mood Media. Dkt. No. 259 at 40, 43, 46. And Plaintiffs dropped their previously asserted claims of unjust enrichment (Count 7), fraud (Count 8), and unfair competition (Count 9). *Compare* Dkt. No. 82 (Second Amended Complaint) *with* Dkt. No. 259 (Fourth Amended Complaint).

allegation in response to Defendants' discovery requests, so Judge Torres ordered Plaintiffs to identify—"with specificity"—how their alleged trade secrets were supposedly disclosed to Stingray. SUMF ¶ 53; SUMF Ex. 7 at 52:2–5. Judge Torres explained:

> Whatever [Hernandez is] claiming that he has disclosed to them, I think he needs to do it **with specificity**. When was that disclosed, how was it disclosed, and to whom was it disclosed to.

SUMF Ex. 7 at 52:2–5 (emphasis added).

Plaintiffs, however, could not provide the required "specificity" because no one at Mood Media ever had access to Plaintiffs' (alleged) trade secrets. SUMF ¶ 10. According to Plaintiffs, the MediaPlug "servers contained the source code implementation of [their alleged] trade secrets." SUMF ¶ 6. But that source code was never accessed by anyone at Mood Media. SUMF ¶ 10. This was confirmed by Mood Media's corporate witness, Trey Courtney:

> Q. Okay did anybody at Mood Media have physical access to the media plug servers?
>
> A. No.

SUMF Ex. 1 at 120:14–16. Although the MediaPlug servers included "Remote Access and monitoring" capabilities (SUMF Ex. 1 at 123:2–124:18, 205:7–206:18), Courtney explained that Mood Media could not use that remote-access capability to obtain Plaintiffs' source code. SUMF Ex. 1 at 206:19–21 ("Q. Can you use that remote access to get access to the source code? A. No.").

Courtney's testimony was later confirmed by Mood Media's former employee, Alejandro Cacciola, who personally interacted with Hernandez in the 2012-to-2014 timeframe:

> Q. Now, did you ever access the source code that was on any of these servers?
>
> A. No.
>
> Q. Would you even know how to access the source code that was on any of these servers?

> A. No.

> Q. That's because you have zero technical background, fair?

> A. That's correct.

SUMF Ex. 9 at 147:16–24. He also confirmed that he was unaware of anyone from Stingray or

Mood Media accessing or requesting access to Plaintiffs' confidential information:

> Q. Now, did you ever share any confidential information from either EGLA or Dr. Hernandez with Stingray?

> A. No.

> Q. Did anyone at Stingray ever ask you to give them any confidential information from EGLA or Dr. Hernandez?

> A. No.

> Q. Did anyone at Stingray ever ask you how the EGLA platform worked in any way, shape or form?

> A. No.

*Id.* at 148:21–149:6; *see also id.* at 149:7–150:15, 151:14–23.

Another former employee of Mood Media, Gustavo Tonelli, also confirmed similar facts.

SUMF Ex. 8 at 203:21–204:7, 205:1–6, 206:8–208:3. He testified, for example, that he never

accessed the source code on Plaintiffs' servers, he had no engineering background or experience

writing or reviewing source code, and he was unaware of anyone from Stingray or Mood Media

having access or requesting access to the source code on Plaintiffs' servers. *Id.*

The testimony of those three witnesses confirms two *undisputed* facts: (i) Mood Media

never had access to Plaintiffs' source code, SUMF ¶¶ 10, 11; and (ii) Mood Media never

disclosed that source code, or any of Plaintiffs' other confidential information, to Stingray.

SUMF ¶ 17.

**C.      Lacking any evidence of any improper disclosure, Plaintiffs pivoted from their original _disclosure_ theory of wrongdoing to a new _hacking_ theory.**

"The Court agrees that Plaintiffs have now changed their argument to alleging that Stingray hacked Plaintiffs' servers." Dkt. No. 349 at 3 ¶ 3, 7 ¶ 3. Indeed, Hernandez himself confirmed this new _hacking_ theory at his deposition. SUMF ¶ 29.

He explained several times that the ███" trade secrets Plaintiffs are asserting in this litigation relate to source code "███████████████ SUMF ¶ 30; SUMF Ex. 11 at 649:19–23; _see also_ SUMF Ex. 10 at 324:17–18. He testified:

███████████████████████████
███████████████

SUMF Ex. 11 at 650:24–651:2; _see also_ SUMF Ex. 10 at 324:19–20; SUMF Ex. 11 at 473:9–11, 649:13–16. He confirmed that the documents, presentations, and emails that Hernandez gave to Mood Media in accordance with the parties' non-disclosure agreement are "████████ ████████" _Id._ at 650:11–15; SUMF ¶ 31. Instead, the trade secrets at issue in this case are the ones found in the source code:

███████████████████████████
███████████████████████████

_Id._ at 472:20–25.

But the source code on Plaintiffs' servers was, according to Hernandez, protected with ███████████████████████ SUMF Ex. 10 at 232:19–21; SUMF ¶ 36. That made the servers ███████████ SUMF ¶ 36. ████████████ ████████████████████████ (SUMF ¶ 39).



SUMF Ex. 10 at 234:16–235:5.

It is undisputed, however, that Hernandez never once received any such alert:

*Id.* at 235:25–236:7; SUMF ¶ 37.

Despite never receiving any alert of any attempted hack, Hernandez still alleges that such

a hack occurred because, he says, Defendants disconnected his servers from the internet:



SUMF Ex. 10 at 235:11–18. So, rather than using the internet, Hernandez's theory is that

Stingray hacked into his servers by taking



*Id.* at 236:9–14.

**D.     Plaintiffs lack evidence of any alleged hack—candidly conceding that they do not know *who* supposedly hacked their servers, *which* server was allegedly hacked, nor *when* that unknown hack supposedly occurred.**

Plaintiffs have no direct evidence of any hack. They do not know *who* allegedly hacked

their servers:



*Id.* at 177:9–12; SUMF ¶ 40. They do not know *which* server was supposedly hacked:



SUMF Ex. 11 at 567:22–568:1; SUMF ¶ 41. Nor do they know *when* the alleged hack

supposedly occurred:



SUMF Ex. 10 at 180:7–12; SUMF ¶ 42. Plaintiffs do not have any evidence—such as access

logs—that would show if and when anyone from Stingray ever accessed the cable operators' data

centers where Plaintiffs' servers were located. SUMF ¶ 43. And Plaintiffs acknowledged that

they did not even *try* to get this information from the cable operators. SUMF ¶44.

Plaintiffs' only so-called "evidence" of a hack is something called a Trello ticket:



SUMF Ex. 10 at 237:7–10; SUMF ¶ 32. But a "Trello ticket" is merely "a support request or task

within Trello," which "is a project management tool that helps companies organize tasks and

manage workflows." SUMF ¶ 34. And Plaintiffs acknowledge that those Trello tickets by

themselves do not show that Stingray hacked into any of Plaintiffs' servers, SUMF ¶ 35, and that

there is "nothing nefarious" in the contents of the Trello tickets, SUMF ¶ 33.

Based on these undisputed facts, Mood Media is entitled to summary judgment on all claims asserted against it (Counts 1, 2, and 6), as explained below.

### III.   LEGAL STANDARD

"[A] party may move for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). Although Local Rule 56.1(c) prohibits "[f]iling and service of multiple motions for partial summary judgment," Judge Torres granted Mood Media authorization to "seek relief on the merits if Mood Media believes" there is an inadequate basis in the record "for Plaintiffs' allegation that Mood Media misappropriated Plaintiffs' alleged trade secrets." Dkt. No. 349 at 7 ¶ 4. This authorization came after Mood Media had already filed its first summary-judgment motion. *See* Dkt. No. 304.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party." *Daneshpajouh v. Sage Dental Grp. of Florida, PLLC*, No. 19-cv-62700-RAR, 2021 WL 3674655, at *6 (S.D. Fla. Aug. 18, 2021) (citing *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)).

The non-moving party must "go beyond the pleadings" and point to evidence in the record that shows a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th

Cir. 2009) (internal quotations omitted). Speculation, conjecture, or conclusory statements cannot create a genuine issue of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). Speculation "does not create a genuine issue of fact," but instead "creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba*, 419 F.3d at 1181 (internal quotations omitted). If the non-moving party has had ample opportunity to conduct discovery, it must identify affirmative evidence to support its claim. *Anderson*, 477 U.S. at 257. "The non-moving party's presentation of a 'mere existence of a scintilla of evidence' in support of its position is insufficient to overcome summary judgment." *Id*. at 252.

A complete failure of proof concerning an essential element of the non-movant's case necessarily renders all other facts immaterial and entitles the moving party to summary judgment. *See Celotex*, 477 U.S. at 323; *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294 (11th Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## IV.     ARGUMENT

Plaintiffs' conclusory, speculative, and conspiratorial allegations cannot withstand scrutiny. Mood Media is entitled to summary judgment for two reasons. *First*, there is no record evidence that Plaintiffs' source code was misappropriated. *Second*, there is no record evidence that Mood Media improperly disclosed any of Plaintiffs' confidential information to Stingray.

**A.     Mood Media is entitled to summary judgment on Plaintiffs' trade-secret claims (Counts 1 and 2) because there is no record evidence that the alleged trade secrets in Plaintiffs' source code were misappropriated.**

To prove a claim under the Florida Uniform Trade Secrets Act ("FUTSA"), Plaintiffs "must demonstrate that (1) [they] possessed a trade secret and (2) the secret was misappropriated." *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th

Cir. 2018) (cleaned up). The FUTSA mirrors the Defend Trade Secrets Act, so the same standard applies. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 n.13 (11th Cir. 2020). Here, Plaintiffs have no facts to show their trade secrets were "misappropriated."

> **1.  Mood Media never had access to Plaintiffs' source code, so Mood Media could not use that source code in any of its own products nor disclose that source code to Stingray.**

A "misappropriation" is defined as an acquisition, use, or disclosure of another's trade secret by someone who knows or has reason to know that the trade secret was acquired by improper means. Fla. Stat. § 688.002(2); 18 U.S.C. § 1839(5). As explained below, Mood Media neither (i) *acquired*, (ii) *used*, nor (iii) *disclosed* Plaintiffs' source code—the "only" trade secrets Plaintiffs are asserting here. SUMF ¶ 27. Thus, no misappropriation occurred.

*First*, Mood Media never *acquired* Plaintiffs' trade secrets because the undisputed testimony from Mood Media's current and former employees confirms that no one at Mood Media ever had access to Plaintiffs' source code. SUMF ¶¶ 10–11. As set forth above (*see supra* Section II.B), Mood Media's corporate designee, Trey Courtney, testified that no one at Mood Media had "physical access" to Plaintiffs' "media plug servers" (SUMF Ex. 1 at 120:14–16) and that no one at Mood Media could use the "remote access" capability of those servers "to get access to the source code" (*id.* at 206:19–21). SUMF ¶¶ 10–11. Similarly, Mood Media's former employees, Alejandro Cacciola and Gustavo Tonelli, confirmed that they never had access to Plaintiffs' source code, nor were they aware of anyone from Stingray or Mood Media ever accessing—or, even, requesting access to—Plaintiffs' source code. SUMF Ex. 9 at 147:16–24; SUMF Ex. 8 at 203:21–204:7, 205:1–6, 206:8–208:3; SUMF ¶¶ 11, 17. The testimony from those three individuals is undisputed and supports summary judgment in Mood Media's favor. *See HCC Ins. Holdings, Inc. v. Flowers*, 237 F.Supp.3d 1341, 1353 (N.D. Ga. 2017) (granting summary judgment where defendant's "direct evidence, including the deposition testimony of"

its employees, confirmed that no trade-secret misappropriation occurred); *Axiom Worldwide, Inc. v. HTRD Grp. Hong Kong Ltd.*, No. 8:11-cv-1468-T-33TBM, 2013 WL 2712787, at *8 (M.D. Fla. June 12, 2013) (granting summary judgment where defendant presented "sworn testimony" of no trade-secret misappropriation, which was not "refute[d]").

*Second*, there is no record evidence that Mood Media ever *used* Plaintiffs' source code. Plaintiffs' expert, Burko Furht, confirmed he has no evidence that any Mood Media product uses any of Plaintiffs' alleged trade secrets. SUMF ¶ 45; SUMF Ex. 14 at 221:8–25 ███████████ ██████████████████████████████████████████████████████████████████ ████████████████████████; *see also id.* at 209:9–210:14. Like Furht, Hernandez admitted that the Trello tickets Plaintiffs point to as so-called evidence of the alleged trade-secret misappropriation relates to a Stingray product, not a Mood Media product. SUMF ¶ 46; SUMF Ex. 11 at 633:8–13 ██████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████ In fact, Judge Torres declined to "compel Mood Media to produce its confidential technical information," in part, because, "Plaintiffs ha[d] been unable to make out any factual allegation that Mood Media used any of Plaintiffs' alleged trade secrets." Dkt. No. 349 at 8–9.

*Third*, Mood Media did not *disclose* Plaintiffs' trade secrets to Stingray because, as explained above, Mood Media never even had access to Plaintiffs' source code. So Mood Media could not possibly disclose something it never had.

In summary, Mood Media did not "misappropriate" any of the alleged trade secrets in Plaintiffs' source code because the undisputed facts show that Mood Media never accessed, used, or disclosed that source code.

> **2.      Plaintiffs have no evidence that Stingray hacked into Plaintiffs' servers, let alone that Mood Media was somehow complicit in that (alleged) hack.**

Because there is no record evidence to support any allegation that Mood Media improperly disclosed Plaintiffs' source code to Stingray, Plaintiffs pivoted from a *disclosure* theory of wrongdoing to a *hacking* theory. *See supra* Section II.C; *see also* Dkt. No. 349 at 3 ¶ 3, 7 ¶ 3 ("The Court agrees that Plaintiffs have now changed their argument to alleging that Stingray hacked Plaintiffs' servers."). According to this new hacking theory, Plaintiffs vaguely allege that "Mood Media allowed Stingray to have an environment to copy and illegally access the contents of the servers[.]" Dkt. No. 324 at 9. That allegation is absurd. And no credible evidence exists to substantiate it.

*First*, Plaintiffs cannot even identify the basic facts of the alleged hack. Hernandez admitted that he does not know *who* allegedly hacked Plaintiffs' servers (SUMF ¶ 40), *what* server was supposedly hacked (SUMF ¶ 41), nor *when* that unknown hack allegedly occurred (SUMF ¶ 42). Without these basic facts, Plaintiffs' claims of trade-secret misappropriation must fail. *See Sterpetti v. E-Brands Acquisition, LLC*, 6:04-cv-01843-ORL-3DA, 2006 WL 1046949, at *10 (M.D. Fla. Apr. 20, 2006) (granting summary judgment of no trade-secret misappropriation where plaintiff offered only "vague assertions" of misappropriation "unsupported" by any "*who*," "*what*," and "*when*").

*Second*, Hernandez ███████████████████████████████████████████ ████. SUMF ¶ 37. Plaintiffs acknowledge that there was ██████████████████ ████████████████ where Plaintiffs servers were located and that accessing a data center would have generated an access log. SUMF ¶¶ 8–9. But Plaintiffs have no access logs showing that anyone from Stingray was ever able to access those servers at the cable operators' data center. SUMF ¶43. And Plaintiffs never even attempted to seek any information from the cable

operators regarding who, if anyone, ever had access to Plaintiffs' servers. SUMF ¶44. With "no record evidence," Plaintiffs resort to nothing more than "rank speculation" of a hack, which is insufficient to withstand summary judgment. *Border Collie Rescue, Inc. v. Ryan*, 418 F.Supp.2d 1330, 1339 (M.D. Fla. Feb. 28, 2006) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)) (granting summary of no trade-secret misappropriation where "conclusory allegations" "without any factual basis" of trade-secret misappropriation "amount to nothing more than rank speculation"); *Yauld Enters., Inc. v. Bars Distrib., LLC*, No. 11-60075-CIV-SEITZ/SIMONTON, 2011 WL 13217290, at *9 (S.D. Fla. Oct. 31, 2011) (granting summary judgment of no misappropriation where plaintiff alleged "in conclusory fashion" that defendants disclosed customer lists despite "no record evidence" to support such a disclosure).

*Third*, even if Stingray got by the physical security to gain access to Plaintiffs' servers, Plaintiffs have no evidence that Stingray had the capability to bypass Hernandez's ██████ ████████████████████████████████████████████████ much less that Stingray was actually able to do so. *See supra* Section II.C. For example, the data encryption used by Plaintiffs is "one of the most secure encryption methods available today." SUMF ¶ 47. According to Stingray's expert, Dr. Malek, "a brute-force attack on a file system encrypted with AES-256 is computationally infeasible." SUMF ¶ 48. "Even with a supercomputer," Dr. Malek explained, "it would take longer than the age of the universe" to hack into a server with that data encryption. SUMF ¶ 48. And, with respect to Plaintiffs' password protection, Dr. Malek explained that it would be more likely for someone to "win the lottery seven times in a row" than it would be for Stingray to "get[] lucky" and guess Plaintiffs' password to gain access to their servers. SUMF ¶ 49.

Finally, and most importantly, the alleged hack by Stingray has absolutely nothing to do with Mood Media. As explained above, Mood Media did ***not*** provide any of Plaintiffs' servers to Stingray as part of the asset-purchase agreement. SUMF ¶¶ 12–14. And the asset-purchase agreement "specifically spelled out that the EGLA contract and agreement was not part of that acquisition." SUMF Ex. 1 at 153:6–13. Ignoring these facts, Plaintiffs resorted to nothing but mere speculation. When asked at deposition how Mood Media was supposedly implicated in the alleged hack, Hernandez hypothesizes that " █████████████████████████ █████████████████████████████ SUMF Ex. 11 at 632:1–8. But Plaintiffs have absolutely no facts to support that wild accusation—no phone records, no access logs, nothing. Such rank speculation is not evidence and cannot be used to withstand summary judgment. *See Border Collie Rescue*, 418 F.Supp.2d at 1339 (granting summary of no trade-secret misappropriation where "conclusory allegations" were based on "nothing more than rank speculation"); *Yauld Enterprises*, 2011 WL 13217290, at *9 (granting summary judgment of no misappropriation where plaintiff "in conclusory fashion" alleged defendants improperly disclosed customer lists despite "no record evidence" of such a disclosure).

\* \* \*

In sum, there is no record evidence that Mood Media misappropriated Plaintiffs' trade secrets by improperly acquiring, using, or disclosing Plaintiffs' source code. Nor is there any record evidence that Stingray hacked into Plaintiffs' servers—let alone that Mood Media was somehow complicit in such a hack. Because there are no triable issues of fact on Counts 1 and 2, Mood Media is entitled to summary judgment of no trade-secret misappropriation.

- 16 -

**B.**     **Mood Media is entitled to summary judgment on Plaintiffs' breach-of-contract claim (Count 6) because there is no evidence that Mood Media improperly disclosed any confidential information to Stingray.**

To succeed on a breach-of-contract claim, Plaintiffs must establish "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc*., 564 F.3d 1256, 1272 (11th Cir. 2009). Here, Plaintiffs' initial theory was that Mood Media supposedly breached some unspecified non-disclosure obligation by disclosing Plaintiffs' "confidential and proprietary strategies, architecture documents, and software strategies" to Stingray. Dkt. No. 259 ¶ 7. After pivoting to the *hacking* theory, however, Hernandez later clarified that ███████████████████████████████████████ ████████████████████████████████████████████████ SUMF ¶ 52. But neither theory is supported by any record evidence. Thus, as explained below, Mood Media is entitled to summary judgment on the breach-of-contract claim (Count 6).

**1.**     **The presentations, documents, and emails Plaintiffs provided to Mood Media do not contain any of Plaintiffs' alleged trade secrets.**

Again, the "only" trade secrets that Plaintiffs assert in this litigation relate to the source code ███████████████████████ SUMF ¶ 30. In Hernandez's own words, the trade secrets were ████████████████████ SUMF Ex. 11 at 649:13–16. And he agreed that ████████████████████████████████████████████ ████████████████████████████ *Id.* at 473:9–11. Plaintiffs are not seriously contending that their alleged trade secrets are contained within the presentations, documents, and emails that Plaintiffs provided Mood Media when they worked together.

Moreover, Plaintiffs' expert, Dr. Furht, admitted he ████████████████████ ██████████████████████████████████████████████████ ███████████████ SUMF ¶ 50; *see also* SUMF Ex. 14 at 209:1–8. Similarly, Mood

Media's corporate witness, Trey Courtney, was shown eight documents that Plaintiffs provided to Mood Media when they worked together, and he confirmed—based on his more than twenty years of technical experience—that those documents contain no trade secrets. SUMF ¶ 51.

> **2.      There is no evidence Mood Media improperly disclosed Plaintiffs' source code, or any other confidential materials, to Stingray.**

As explained above, Mood Media could not possibly disclose Plaintiffs' source-code-related trade secrets to Stingray because Mood Media never even had access to that source code. *See supra* Section IV.A.1. And even if Plaintiffs' documents, presentations, and emails contained any of the alleged trade secrets asserted in this case (███████████████████████ ██████ (SUMF ¶ 31)), there is no record evidence that Mood Media improperly disclosed those materials to Stingray.[4] In fact, the record evidence leads to the opposite conclusion: Cacciola and Tonelli both testified that they never provided any of Plaintiffs' confidential information to Stingray. SUMF ¶ 17. Plaintiffs have no record evidence to refute that testimony.

* * *

In sum, the undisputed facts lead to a straightforward conclusion: Mood Media could not disclose information it did not have. There is no genuine dispute that Mood Media never had access to the source code inside Plaintiffs' servers. Nor is there a genuine dispute that the

---

[4] To the extent Plaintiffs assert that their breach-of-contract claim stems from the presentations, documents, and emails that they gave to Mood Media, then it would be undisputed that Plaintiffs knew that they gave those materials to Mood Media. As a result, if Plaintiffs were to assert a breach-of-contract theory based on the materials they gave to Mood Media, then such a theory would certainly be time-barred for the reasons set forth in Mood Media's first summary-judgment motion. Dkt. No. 304 at 10. That is presumably why Hernandez confirmed in his deposition that "the breach of confidentiality that we're accusing in this case is the *source code* that you allowed to be taken over by Stingray." SUMF Ex. 11 at 680:14–16 (emphasis added); *see also* SUMF ¶ 52.

materials Plaintiffs provided to Mood Media simply do not contain any of Plaintiffs' trade secrets. So Mood Media is entitled to summary judgment on the breach-of-contract claim.

## V.     CONCLUSION

This frivolous case has gone on far too long. After nearly a year and a half of discovery, Plaintiffs have resorted to wild conjectures, pivoting from a *disclosure* theory of wrongdoing to a *hacking* theory, rather than accepting the inevitable—that there simply are no facts to support their frivolous claims. The reason no such evidence exists is simple: Mood Media has done nothing wrong. They did not disclose Plaintiffs' trade secrets or confidential information to Stingray. Nor did Mood Media allow Stingray to hack into Plaintiffs' servers. This Court should grant summary judgment on all issues and put an end to this meritless case.

Dated:  November 17, 2025

Respectfully submitted,

*/s/ David C. Banker*
Michael Specht
Jonathan Tuminaro
Uma Everett
Lauren Watt
Tyler Dutton
Paige Cloud
Madisyn Richards
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1101 K St. NW, 10th Floor
Washington, D.C. 20005
Telephone: (202) 371-2600
mspecht@sternekessler.com
jtuminar@sternekessler.com
ueverett@sternekessler.com
lwatt@sternekessler.com
tdutton@sternekessler.com
pcloud@sternekessler.com
mrichards@sternekessler.com

David C. Banker
Florida Bar No. 35977
BUSH ROSS, P.A.
1801 North Highland Avenue
Tampa, Florida 33602 2656
Telephone: (813) 224-9255
Fax: (813) 223-9620
dbanker@bushross.com

*Counsel for Defendant Mood Media LLC.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule 5.2(a) on November 17, 2025.  As such, this document was served on all counsel of record pursuant to Local Rule 5.2(a) and the Federal Rules of Civil Procedure.

*/s/ David C. Banker*
David Banker

- 20 -